Kerry K. Fennelly (SBN 232621)
kfennelly@kraw.com
Valentina S. Mindirgasova (SBN 272746)
vmindirgasova@kraw.com
Kraw Law Group, APC
1017 East Grand Avenue
Escondido, CA 92025
(760) 747-1100 tel
(760) 747-1188 fax

Attorneys for Plaintiffs,
GCIU-Employer Retirement Fund and
Board of Trustees of the
GCIU-Employer Retirement Fund

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND AND BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND, <br><br> Plaintiffs, <br><br> v. <br><br> THE MAREK GROUP, INC., a Wisconsin Corporation, <br><br> Defendant. | CASE NO. 2:20-cv-02074 <br><br> **COMPLAINT** <br><br> Collection of Benefit Contributions pursuant to ERISA Section 515 (29 U.S.C. § 1145) |

## **COMPLAINT**

Plaintiffs, GCIU-Employer Retirement Fund and Board of Trustees of the GCIU-Employer Retirement Fund, for causes of action against Defendant The Marek Group, Inc., allege as follows:

COMPLAINT

**JURISDICTION AND VENUE**

1.     This is an action for collection of contributions from Defendants due and owing to the GCIU-Employer Retirement Fund ("Fund").  This action arises under section 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145.

2.     This court has jurisdiction over this action under ERISA Sections 502(e), 29 U.S.C. §§ 1132(e).

3.     Venue lies in this Court under ERISA Sections 502(e)(2) and 4301(d), 29 U.S.C. §§ 1132(e)(2) and 1451(d), in that the GCIU-Employer Retirement Fund ("Fund") is administered in Los Angeles County, California.

**PARTIES**

4.     Plaintiff Fund is a multiemployer pension plan within the meaning of ERISA Sections 3(37) and 4001(a)(3), 29 U.S.C. §§ 1002(37) and 1301(a)(3).

5.     Plaintiff Board of Trustees of the GCIU-Employer Retirement Fund ("Board of Trustees") is comprised of the present trustees who are the named fiduciaries of the Fund within the meaning of ERISA Section 402(a), 29 U.S.C. §1102(a), and is the plan sponsor of the Fund within the meaning of ERISA Sections 3(16)(B)(iii) and 4001(a)(10), 29 U.S.C. §§ 1002(16)(B)(iii) and 1301(a)(10).  The Board of Trustees administers the Fund in Los Angeles County, California.

6.     Pursuant to ERISA Sections 502(a)(3) and 4301(a)(1), 29 U.S.C. §§ 1132(a)(3) and 1451(a)(1), the Board of Trustees is authorized, as a named fiduciary, to bring this action on behalf of the Fund, its participants and beneficiaries for the purpose of collecting withdrawal liability. The Fund is also authorized to bring this action in its own name pursuant to a provision contained within Article VIII, Section 18 of the Plaintiff Fund's Trust Agreement, which permits all legal actions to be prosecuted in the name of the Fund.  A true and correct copy of the Fund's Trust Agreement is attached hereto as Exhibit 1.

COMPLAINT

7.     Defendant The Marek Group, Inc. ("Marek Group") is an active corporation organized under the laws of the State of Wisconsin.

8.     At all times relevant to this action, Defendant has been an "employer" as the term is defined by ERISA Section § 3(5), 29 U.S.C. § 1002(5), and was engaged in an industry affecting commerce, as defined by section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a).

## CLAIM FOR RELIEF

(Collection of Minimum Total Annual Benefit Contributions)

9.     Plaintiffs hereby reallege and incorporate each and every allegation made in paragraphs 1 through 8 of this Complaint as though fully set forth herein.

10.     Section 515 of ERISA, 29 U.S.C. § 1145, provides that:

> "Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

10.     At all times relevant herein, Defendant was a party to a Collective Bargaining Agreement ("CBA") with the Graphic Communications Conference/ International Brotherhood of Teamsters Local 577-M ("Local Union").  A true and correct copy of the CBA is attached hereto as Exhibit 2.

11.     Pursuant to Defendant's CBA with the Local Union, Defendant is bound by the terms, conditions, rules, and regulations of the Fund's Trust Agreement and Rehabilitation Plan.

12.     The CBA and the Trust Agreement obligate Defendant to remit contributions to the Plaintiff Fund.

13.     Plaintiff Fund's Rehabilitation Plan obligates each participating employer to pay a minimum annual contribution amount. Specifically, the Rehabilitation Plan states that,

> "Effective for each calendar year on or after the adoption of the Rehabilitation Plan by the bargaining parties, the required minimum contributions (including the base contribution and the rehabilitation plan contributions increases) for each employer (determined on a controlled group basis) will be no less than the total annual contributions for the that employer from September 1, 2008 through August 31, 2009."

A true and correct copy of the relevant Rehabilitation Plan provision is attached hereto as Exhibit 3.

14.     Between September 1, 2008 through August 31, 2009, ("base period"), Defendant's total contributions totaled $53,677.50.

15.     For the period of January 1, 2018 through December 31, 2018, Defendant's total annual contributions were $21,099.47. As such, Defendant underpaid its minimum total annual contributions by $32,688.03.

16.     Plaintiffs notified Defendant of their outstanding underpaid minimum total annual contribution by letters sent on April 26, 2019, May 28, 2019, and July 1, 2019. However, Defendant has not paid the $32,688.03 due and owing.

17.     Defendant owes a total of $32,688.03 in underpaid benefit contributions for the period of January 1, 2018 through December 31, 2018.

18.     Pursuant to Plaintiff Fund's Trust Agreement and 29 U.S.C. §1132(g)(2), in the event the Defendant fails to timely remit the contributions, it is liable not only for the amount of contributions due, but also for: (1) interest on the unpaid and untimely paid Fund contributions, at the rate of ten percent (10%) per annum, plus (2) the greater of interest on the unpaid and untimely paid Fund contributions or liquidated damages equal to twenty percent (20%) of those delinquent contributions; plus (3) costs and fees of collection and attorneys' fees.

19.     Defendant owes $32,688.03 in underpaid minimum total annual contributions for the period of January 1, 2018 through December 31, 2018, applicable interest and liquidated damages, and attorney's fees and costs.

20.     By reason of the foregoing, Defendant is indebted to Plaintiffs in the sum of $32,688.03, plus interest, liquidated damages, attorneys' fees, and costs.

4

COMPLAINT

WHEREFORE, Plaintiffs request the following relief:

(i)     $32,688.03 in underpaid minimum total annual benefit contributions for the period of January 1, 2018 through December 31, 2018;

(ii)    Judgment against the Defendants for (1) interest from December 31, 2018, at the rate of ten percent (10%) per annum; plus (2) the greater of interest on the $32,688.03 in delinquent contributions or liquidated damages equal to twenty percent (20%) of those delinquent contributions; plus (3) costs and fees of collection and attorneys' fees.

(iii)   Plaintiffs' reasonable attorneys' fees and costs of the action incurred herein in accordance with the Trust Agreement and ERISA Sections 502(g)(2)(D) and 4301(e), 29 U.S.C. §§ 1132(g)(2)(D) and 1451(e); and

(iv)    Such other legal and equitable relief as the Court deems appropriate.

Dated: <u>March 3, 2020</u>

/s/ Valentina S. Mindirgasova
Kerry K. Fennelly
Valentina S. Mindirgasova
Kraw Law Group, APC
1017 East Grand Avenue
Escondido, CA 92025
(760) 747-1100
(760) 747-1188
kfennelly@kraw.com
vmindirgasova@kraw.com

Attorneys for Plaintiffs

# EXHIBIT 1

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 6
2:20-cv-02074



# GCIU-EMPLOYER RETIREMENT FUND

## Trust Agreement

**Effective January 1, 1976**

**As Revised and Restated December 1, 2012**

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 7

2:20-cv-02074

# TABLE OF CONTENTS

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARTICLE I — DECLARATION OF TRUST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    1. Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    2. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    3. Nature of Trust Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    4. Duration of Trust Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    5. Term of Trust Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARTICLE II — DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

ARTICLE III — THE TRUSTEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    1. The Board of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    2. Statutory Capacities of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    3. Agents for Service of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    4. Number of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    5. Alternate Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    6. Identity of Present Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    7. Appointment of Successor Employer Trustees . . . . . . . . . . . . . . . . . . 6

    8. Appointment of Successor Labor Organization Trustees . . . . . . . . . . . . . . 6

    9. Individuals Disqualified from Serving as Trustees . . . . . . . . . . . . . . . . . .6

    10. Acceptance of Appointment by Trustees . . . . . . . . . . . . . . . . . . . . . . . . 6

    11. Term of Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    12. Termination of Appointment by Appointing Entity . . . . . . . . . . . . . . . . . 6

    13. Termination of Appointment for Failure to Attend Meetings . . . . . . . . . . . 7

    14. Termination of Appointment for Conviction of a Crime . . . . . . . . . . . . . .7

    15. Termination of Appointment for Mental Incapacity . . . . . . . . . . . . . . . . .7

    16. Resignation of Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    17. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

    18. Return of Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

— A —

ARTICLE IV — TRUST FUND ADMINISTRATION . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   1. Manner of Voting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   2. Constitution of a Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   3. Proxies Prohibited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   4. Regular Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   5. Special Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

   6. Action without a Formal Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   7. Failure of the Trustees to Agree—Arbitration . . . . . . . . . . . . . . . . . . . . . 8

   8. Election of Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

   9. Duties of Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

   10. Authorized Signatures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

   11. Compensation and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

   12. Benefits to Trustees Not Prohibited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE V — PARTICIPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   1. Bargaining Unit Employees Entitled to Participate . . . . . . . . . . . . . . . . . .11

   2. Labor Organization Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

   3. Non-Bargaining Unit Employees of Participating Employers . . . . . . . . . . 11

   4. Transferred Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

   5. Trust Fund Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

   6. Unauthorized Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

   7. Sole Proprietors and Partners Ineligible . . . . . . . . . . . . . . . . . . . . . . . . . .12

   8. Participation of Non-Bargaining Unit Employees . . . . . . . . . . . . . . . . . . .12

ARTICLE VI — TRUSTEE RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

   1. General Duty - Receipt of Contributions and Administration of the Retirement
     Benefit Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

   2. Compliance with the Internal Revenue Code . . . . . . . . . . . . . . . . . . . . . . . 13

   3. Funding Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

   4. Basis of Payments to and from Trust Fund . . . . . . . . . . . . . . . . . . . . . . . . 13

   5. Application of Trust Fund Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   6. Fiduciary Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

— B —

7. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

8. Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

9. Specifically Permitted Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10. Title to Investments and Other Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11. Fidelity Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

12. Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

13. Annual Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

14. Annual Actuarial Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

15. Plan Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

16. Annual Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

17. Statements of Accrued Pension Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18. Pension Funding Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

19. Income Tax Withholding and Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . .17

20. Documents to be Examined or Furnished . . . . . . . . . . . . . . . . . . . . . . . . . .17

21. Procedure for Establishing Funding Policy . . . . . . . . . . . . . . . . . . . . . . . . .18

22. Payments to Pension Benefit Guaranty Corporation . . . . . . . . . . . . . . . . .18

23. Benefit Claim and Review Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

ARTICLE VII — ALLOCATION OR DELEGATION OF TRUSTEE
              RESPONSIBILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

1. Allocation of Responsibilities to Committees . . . . . . . . . . . . . . . . . . . . . . . 19

2. Delegation of Investment Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . 19

3. Delegation of Other Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4. Review of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

ARTICLE VIII - TRUSTEE POWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

1. General Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

2. Specific Powers Discretionary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

3. Benefit Plan Being Administered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4. Amendments to the Benefit Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5. Means of Providing Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

6. Facility of Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

— C —

7. Administrative Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

8. Banking Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

9. Other Professional and Non-Professional Persons . . . . . . . . . . . . . . . . . . . . 22

10. Obtaining of Necessary Premises, Equipment, and Supplies . . . . . . . . . . . 22

11. Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

12. Borrowing Money . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

13. Reserve Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

14. Payment of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

15. Refunds of Contributions Erroneously Paid . . . . . . . . . . . . . . . . . . . . . . . . . 23

16. Penalties for False or Withheld Information . . . . . . . . . . . . . . . . . . . . . . . . . 23

17. Correction of Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

18. Prosecution of Legal Actions or Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19. Defense of Legal Actions or Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

20. Compromise of Legal Actions or Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

21. Subscription and Participation Agreements . . . . . . . . . . . . . . . . . . . . . . . . . 24

22. Participation in Non-Profit Educational Organizations . . . . . . . . . . . . . . . . 24

23. Reciprocity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

24. Mergers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

25. Eligible Rollover Plan Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

26. Interpretation and Application of Documents . . . . . . . . . . . . . . . . . . . . . . . . 25

27. Adoption and Implementation of a Funding Improvement Plan and
    Rehabilitation Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

ARTICLE IX — CONTRIBUTIONS AND COLLECTIONS . . . . . . . . . . . . . . . . . . . 27

1. Contribution Reporting Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

2. Contributions Due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

3. Contribution Due Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

4. Delinquent Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

5. Audit of Employer Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

6. Liquidated Damages, Attorneys Fees, Interest, and Other Charges . . . . . . 28

7. Additional Liquidated Damages in Event of Court Judgement . . . . . . . . . 28

— D —

8. Waiver of Charges  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

9. Protection of Employees in Cases of Delinquency  . . . . . . . . . . . . . . . . . . 28

10. Coordination with Provisions in Collective Bargaining Agreements  . . . . . 29

ARTICLE X — EMPLOYER WITHDRAWAL LIABILITY  . . . . . . . . . . . . . . . . . . . 30

1. Calculation and Collection of Employer Withdrawal Liability  . . . . . . . . . 30

2. Determination of Amount of Unfunded Vested Benefits Allocable
to Withdrawing Employer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

3. Payment of Withdrawal Liability in Monthly Installments  . . . . . . . . . . . . 30

4. Adoption of Administrative Rules and Regulations  . . . . . . . . . . . . . . . . . . 30

5. Notice of Potential Withdrawal Liability  . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE XI — BENEFIT CLAIM, HEARING AND ARBITRATION
PROCEDURES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

1. Hearings Required  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

2. Requests for Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

3. Conduct of Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

4. Hearing Rules  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

5. Arbitration - Mandatory  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

6. Benefit Claim and Review Procedures for a Participating Employee or
Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

7. Sole and Exclusive Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

ARTICLE XII — LIMITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

1. Liabilities and Debts of Trust Fund  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

2. Liabilities and Debts of Participating Parties . . . . . . . . . . . . . . . . . . . . . . .34

3. Personal Liabilities of Trustees and Fiduciaries  . . . . . . . . . . . . . . . . . . . .34

4. Judgments against Trust Fund  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

5. Participating Parties' Rights  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

6. Cessation of Participation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

7. Protection of Trust Fund, Contributions, and Benefits  . . . . . . . . . . . . . . . 35

8. Reliance upon Written Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

9. Agents of Trust Fund  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

— E —

ARTICLE XIII —MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    1. Trust Fund Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    2. Applicable Laws and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    3. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    4. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    5. Title—Words . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

    6. Information to be Furnished and Distributed . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE XIV—AMENDMENTS AND TERMINATION . . . . . . . . . . . . . . . . . . . 37

    1. Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

    2. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

    3. Allocation upon Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

SIGNATORY PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

— F —

# PREAMBLE

WHEREAS, the signatory parties (or their predecessors in interest) did previously execute a "Retirement Benefit Plan", with an effective date of October 1, 1955, which document created and governed a joint labor-management employee pension benefit fund presently known as the

**GCIU — Employer**
**Retirement Fund**
**and**

WHEREAS, said document did also create an employee pension benefit plan presently known as the

**GCIU — Employer**
**Retirement Benefit Plan**
**and**

WHEREAS, said document was subsequently amended in several respects, and

WHEREAS, said document was adopted in accordance with the applicable provisions of Section 302(c) of the Labor Management Relations Act of 1947 and applicable provisions of the Internal Revenue Code, and

WHEREAS, the enactment of the Employee Retirement Income Security Act of 1974 mandated the adoption of certain substantive changes in the documents governing employee pension benefit funds and thus required amendment of the existing document, and

WHEREAS, the Trustees have again determined to revise and restate the existing Trust Agreement so as to further take into account contemporary needs and conditions, including amendments which have been made since the September 1, 1999 revision,

NOW THEREFORE, the Trustees and remaining signatory parties do hereby revise and restate the "Trust Agreement", as follows:

— 1 —

# ARTICLE I
# DECLARATION OF TRUST

1.   *Name*

The Trustees and the remaining signatory parties hereby reaffirm the declaration and establishment of a Trust Fund known as the

**GCIU — Employer
Retirement Fund**

The Trustees may hold property, enter into contracts, and in all matters act on behalf of the Trust Fund in such name. The Trust Fund may sue or be sued in such name.

2.   *Purpose*

The purpose of the Trust Fund is to provide an entity to which contributions from participating employers can be paid and through which the Trustees can administer the GCIU—Employer Retirement Benefit Plan for the benefit of the participating employees for whom such contributions have been paid, and their beneficiaries.

3.   *Nature of Trust Fund*

The Trust Fund is a "trust" as contemplated by Section 302(c)(5) of the Labor Management Relations Act of 1947; a "trust" as contemplated by Section 401(a) of the Internal Revenue Code; and a "trust" as contemplated by Section 403(a) of the Employee Retirement Income Security Act of 1974. It is an entity separate and apart from the participating employers, employer associations, and labor organizations.

4.   *Duration of Trust Fund*

The Trust Fund shall continue in existence on an indefinite basis, contemporaneously with the term of this Trust Agreement.

5.   *Term of Trust Agreement*

This revised and restated Trust Agreement shall be effective as of December 1, 2012, and shall continue indefinitely until such time as it may be terminated in accordance with the provisions of Article XIV hereof.

# ARTICLE II
# DEFINITIONS

The following definitions shall govern in this Trust Agreement:

1. "Beneficiary"—any person designated by a participating employee, under the terms of the Retirement Benefit Plan, to receive benefits, if any, upon the death of such participating employee.

2. "Collective bargaining agreement"—a written agreement between a participating employer and a participating labor organization, providing generally for wages, hours, and working conditions, by the terms of which the employer is obligated to make contributions to the Trust Fund on behalf of the bargaining unit employees covered by such an agreement.

3. "Contributions"—the payments which a participating employer is obligated to make to the Trust Fund pursuant to the terms of a collective bargaining agreement, subscription agreement, or participation agreement.

4. "Participating employee"—an individual employed by a participating employer and for whom that employer makes contributions to the Trust Fund, as allowed by the provisions of Article V, Sections 1, 2, 3, 4, and 5 and any individual who formerly was so employed and who has achieved vested or retired status under the terms of the Retirement Benefit Plan.

5. "Participating employer"—any employing entity that is party to a collective bargaining agreement or subscription agreement with a participating labor organization, as allowed by the provisions of Article V, Section 1 hereof. An employing entity may be a sole proprietorship, partnership, unincorporated association, corporation, or joint venture; or the United States of America; or any state, county or municipality; or other public agency, public corporation, or governmental unit.

A participating labor organization, or the Trust Fund, or any related trust fund, shall also be considered as a "participating employer" for the limited purpose of allowing the employees of such entities to participate in the Trust Fund, as permitted by Article V, Sections 2 and 5 hereof.

6. "Participating employer association"—any employer association or multi-employer bargaining group that is party to a collective bargaining agreement with a participating labor organization, as allowed by the provisions of Article V, Section 1 hereof.

7. "Participating labor organization"—Graphic Communications Conference of the International Brotherhood of Teamsters, and any local union, district council, joint district council, conference, or other bargaining agency affiliated with or represented by the Conference, that has entered into a collective bargaining agreement or subscription agreement with a participating employer or employer association, as allowed by the provisions of Article V, Section 1 hereof.

8. "Participation agreement"—a written agreement, in a form approved by the Trustees, by the terms of which a participating employer is obligated to make contributions to the Trust Fund on behalf of the non-bargaining unit employees covered by such an agreement.

9. "Pension benefits" or "employee pension benefits"—the pension and related benefits provided in the Retirement Benefit Plan.

— 3 —

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 17
2:20-cv-02074

10. "Related trust fund"—an employee benefit trust fund, other than this Trust Fund, to which participating employers make contributions as required by collective bargaining agreements with participating labor organizations.

11.   "Retirement Benefit Plan"—The GCIU—Employer Retirement Benefit Plan as constituted on the effective date of this Trust Agreement and as hereafter amended.

12.   "Signatory parties"—the parties who have created this Trust Agreement and whose identities and signatures appear on the last page hereof and their successors. (See Note on page 40)

13.   "Subscription agreement"—a written agreement, in a form approved by the Trustees, by the terms of which a participating employer and participating labor organization subscribe to the terms and provisions of this Trust Agreement, and by the terms of which an employer is obligated to make contributions to the Trust Fund on behalf of the bargaining unit employees covered by such an agreement.

14.   "Trustees" or "Board of Trustees"—the Trustees of the Trust Fund and their successors.

15.   "Trust" or "Trust Fund"—the entity created by this Trust Agreement and all property and money held by such entity, including all contract rights and records.

— 4 —

# ARTICLE III
# THE TRUSTEES

1. *The Board of Trustees*

The Trust Fund and the Retirement Benefit Plan shall be controlled and administered by a Board of Trustees composed of Employer Trustees and Labor Organization Trustees.

2. *Statutory Capacities of Trustees*

For purposes of complying with Section 302(c)(5)(B) of the Labor Management Relations Act of 1947, the participating employers shall be represented, in the administration of the Trust Fund, by the Employer Trustees; and the participating employees shall be represented by the Labor Organization Trustees.

For purposes of complying with the various provisions of the Employee Retirement Income Security Act of 1974 the Trustees shall be considered as "named fiduciaries", "fiduciaries", the "plan administrator", and the "plan sponsor", as those terms are used in the Act.

3. *Agents for Service of Process*

The Trustees shall also be considered as agents of the Trust Fund for the purpose of accepting service of legal process, provided that the Trustees may designate their administrative manager, or another person, as agent of the Trust Fund for this purpose.

4. *Number of Trustees*

There may be up to eighteen (18) Trustees, nine (9) of whom shall be Employer Trustees and nine (9) of whom shall be Labor Organization Trustees.

5. *Alternate Trustees*

There may also be up to ten (10) alternate Trustees, five (5) of whom shall be alternate Employer Trustees and five (5) of whom shall be alternate Labor Organization Trustees.

In the event any Employer Trustee is absent from any meeting of the Trustees he may designate an alternate Employer Trustee to serve in his place and stead. If the absent Employer Trustee fails to make such a designation, the Employer Trustees who are present at the meeting may designate an alternate Employer Trustee to serve in the place and stead of the absent Trustee.

In the event any Labor Organization Trustee is absent from any meeting he may designate an alternate Labor Organization Trustee to serve in his place and stead. If the absent Labor Organization Trustee fails to make such a designation, the Labor Organization Trustees who are present at the meeting may designate an alternate Labor Organization Trustee to serve in the place and stead of the absent Trustee.

The alternate Trustees, if any, shall be appointed in the same manner and retain such appointment under the same conditions as the regular Trustees. When designated to serve for a regular Trustee, and while serving, an alternate Trustee shall have all of the powers and responsibilities of a regular Trustee.

6. *Identity of Present Trustees*

The regular and alternate Trustees serving as of the revised date of this Trust Agreement are:

| *Employer Trustees* | *Labor Organization Trustees* |
|---|---|
| Hugh Gaylord | Edward A. Treacy |
| Jim Janiga | Stephen E. Northup |
| Joseph Conley | John D. Bachler |
| Thomas E. Phillips | George Tedeschi |
| Tom Sarnecki | |
| | *Alternate Labor Organization Trustees* |
| | Ralph Meers |

7. *Appointment of Successor Employer Trustees*

In the event of the termination of appointment, resignation, or death of an Employer Trustee, a successor Employer Trustee shall be appointed by unanimous action of the remaining Employer Trustees.

8. *Appointment of Successor Labor Organization Trustees*

In the event of the termination of appointment, resignation, or death of a Labor Organization Trustee, a successor Labor Organization Trustee shall be appointed by unanimous action of all of the signatory labor organizations. If any signatory labor organization fails, within sixty (60) days, to respond to a suggested appointment made by the other signatory labor organizations, that signatory labor organization will be deemed to have waived its rights to participate in or to contest the appointment.

9. *Individuals Disqualified from Service as Trustees*

No individual who has been convicted of any of the crimes listed in Section 411(a) of the Employee Retirement Income Security Act of 1974 shall serve as a Trustee during the period of disqualification specified in the statute.

10. *Acceptance of Appointment by Trustees*

Each Trustee shall sign a document accepting his appointment as Trustee and agreeing to abide by the terms and provisions of this Trust Agreement.

11. *Term of Appointment*

Each Trustee shall serve until termination of appointment, resignation, or death.

12. *Termination of Appointment by Appointing Entity*

The appointment of an Employer Trustee may be terminated, at any time, by unanimous action of the remaining Employer Trustees.

The appointment of a Labor Organization Trustee may be terminated, at any time, by unanimous action of all of the signatory labor organizations.

The termination of a Trustee's appointment shall be effective upon the termination date specified in a written notice of termination, executed by the group of appropriate Employer Trustees or signatory labor organizations. Any such notice shall be addressed to

— 6 —

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 20
2:20-cv-02074

the Trustees and shall be mailed to the Trust Fund's administrative office.

13.   *Termination of Appointment for Failure to Attend Meetings*

The appointment of a Trustee shall be automatically terminated if such Trustee fails to attend three *(3)* consecutive meetings of the Trustees, without being excused from attendance by specific action of the remaining Trustees noted in the minutes. Alternate Trustees are exempt from this requirement.

14.   *Termination of Appointment for Conviction of a Crime*

The appointment of a Trustee shall be automatically terminated if such Trustee is convicted of any of the crimes listed in Section 411(a) of the Employee Retirement Income Security Act of 1974. If a Trustee who is so disqualified should continue to serve as a Trustee, in circumstances where the remaining Trustees have no knowledge of his disqualification, such service shall not invalidate any of the actions or decisions of the Trustees during the period of such service.

15.   *Termination of Appointment for Mental Incapacity*

The appointment of a Trustee shall be automatically terminated if such Trustee is declared mentally incompetent by court decree.

16.   *Resignation of Appointment*

A Trustee may resign his appointment at any time. Such resignation shall be effective upon the resignation date specified in a written notice of resignation. Any such notice shall be addressed to the Trustees and shall be mailed to the Trust Fund's administrative office.

17.   *Vacancies*

No vacancy in the position of Trustee shall impair the power of the remaining Trustees to administer the affairs of the Trust Fund so long as a quorum exists as specified in Article IV, Section 2 hereof.

18.   *Return of Books and Records*

In the event of the termination of appointment, resignation, or death of a Trustee, the Trustee (or his legal guardian, heirs, or personal representative) shall, upon the request of the Chairman or the Secretary or of the administrative manager, forthwith turn over to the administrative manager, any and all records, books, documents, monies, and other property in the possession of the Trustee, or under his control, that belong to the Trust Fund or that were received by him in his capacity as Trustee.

GCIU-Employer Retirement   EXHIBIT 1 to COMPLAINT - 21
Fund, et al. v. The Marek Group, Inc.   2:20-cv-02074

# ARTICLE IV
# TRUST FUND ADMINISTRATION

1.   *Manner of Voting*

Any action to be taken by the Trustees shall require a favorable vote by the Employer Trustees and by the Labor Organization Trustees, according to the unit method of voting. The Employer Trustees shall have but one vote among them (which shall be determined by a majority of the Employer Trustees present) and the Labor Organization Trustees shall have but one vote among them (which shall be determined by a majority of the Labor Organization Trustees present).

Any Trustee including the Chairman or Secretary may offer or second any motion or resolution for the Trustees' consideration. Any individual Trustee shall be entitled, upon request, to have his vote recorded in the official minutes.

2.   *Constitution of a Quorum*

To constitute a quorum at any meeting of the Trustees there must be present at least three (3) Employer Trustees, or duly designated alternates, and three (3) Labor Organization Trustees, or duly designated alternates.

3.   *Proxies Prohibited*

To encourage full attendance at meetings of the Trustees and due consideration of the matters being voted upon, there shall be no proxies. A Trustee must be present in order to cast a vote.

4.   *Regular Meetings*

The Trustees shall hold regular periodic meetings consistent with the needs of Trust Fund business, provided that there shall be at least two *(2)* regular meetings held during each calendar year. The Trustees shall determine the time and place of all such meetings.

5.   *Special Meetings*

Either the Chairman or the Secretary or any two *(2)* Trustees (one Employer and one Labor Organization Trustee) may call a special meeting of the Trustees by giving written notice to all the other Trustees of the time and place of such meeting, at least thirty (30) days before the date set for the meeting, provided that thirty (30) days advance notice shall not be necessary if all Trustees are agreeable to an earlier meeting.

6.   *Action without a Formal Meeting*

The Trustees may take action without a formal meeting by means of the presentation of a written motion or resolution sent to all Trustees by the administrative manager and the subsequent obtaining of Trustee votes on the motion or resolution in letters, by email, or by facsimile transmission sent by each Trustee to the administrative manager. Any such action shall be reported in the minutes of the next formal meeting.

7.   *Failure of the Trustees to Agree—Arbitration*

In the event the Employer Trustees and Labor Organization Trustees should deadlock on any matter submitted for their consideration, the dispute may be referred by either group of Trustees to an impartial arbitrator in accordance with the labor arbitration rules of the American Arbitration Association. A deadlock shall be deemed to occur when there

is a tie vote on any motion before the Trustees.

The Trustees shall attempt to agree on the joint submission of a statement of the issue in dispute. However, if the Trustees cannot jointly agree upon such a statement, each group of Trustees shall submit to the arbitrator, in writing, its version of the issue in dispute. As part of his award, the arbitrator shall state his determination as to the exact issue.

The decision and award of the arbitrator shall be final and binding upon the Trustees and upon all parties whose interests are affected thereby.

The expenses of any such arbitration, including any court proceedings relating thereto, and the fee of the arbitrator and the reasonable attorney's and witness fees of the parties, shall be chargeable to the Trust Fund.

The procedure specified in this Section shall be the sole and exclusive procedure for the resolution of deadlocked issues.

8.   *Election of Officers*

The Trustees shall elect a Chairman, Vice-Chairman, Secretary and Assistant Secretary. Two of these officers shall be Employer Trustees and two shall be Labor Organization Trustees. When the Chairman is an Employer Trustee, the Vice-Chairman shall also be an Employer Trustee; when the Secretary is a Labor Organization Trustee, the Assistant Secretary shall also be a Labor Organization Trustee, or vice-versa.

The officers shall hold office indefinitely, provided that at the first regular meeting in each odd numbered year, either the Employer Trustees or the Labor Organization Trustees may obtain, on their request, a rotation of all offices and a new election of all officers.

An officer may resign his office at any time. Such resignation shall be effective upon the resignation date specified in a written notice of resignation. Any such notice shall be addressed to the Trustees and shall be mailed, emailed or faxed to the Trust Fund's administrative office. In case of the resignation, death, or termination of appointment of either the Chairman or the Secretary, there shall be a new election of all offices. In case of the resignation, death, or termination of appointment of either the Vice-Chairman or the Assistant Secretary, there shall be a new election of that office only.

9.   *Duties of Officers*

The Chairman shall chair the meetings of the Trustees, shall appoint all committees and shall carry out such other duties as the Trustees may assign to him. The Vice-Chairman, in the absence of the Chairman, shall act in place of the Chairman and perform the Chairman's duties.

The Secretary shall advise the Trustees as to all correspondence and financial reports pertaining to the Trust Fund and shall keep minutes or records of all meetings, proceedings, and actions of the Trustees, provided that these particular responsibilities may be delegated to the administrative manager or to other professional persons retained by the Trustees. The Assistant Secretary, in the absence of the Secretary, shall act in place of the Secretary and perform the Secretary's duties.

10.   *Authorized Signatures*

The Chairman or the Vice-Chairman, and the Secretary or the Assistant Secretary, shall sign all negotiable instruments, certificates, contracts, government reports, and other

— 9 —

legal documents on behalf of the Trust Fund, provided that the authority for signing nego-tiable instruments may be delegated to the administrative manager, corporate trustee (if any), depository bank, or custodian bank. All persons doing business with the Trust Fund may rely on such signatures.

If the Trust Fund issues benefit checks to participating employees or their beneficia-ries, the signatures of the Chairman and Secretary may be affixed thereto by a facsimile signature device, under safeguards determined by the Trustees.

11.   *Compensation and Expenses*

No Trustee shall receive any compensation from the Trust Fund for services as a Trustee.

Each Trustee (and each alternate Trustee who is called upon to substitute for an absent Trustee) shall be reimbursed out of the Trust Fund for all expenses properly and actually incurred by him in the administration of the Trust Fund. The Trustees shall estab-lish the conditions for the reimbursement of expenses.

12.   *Benefits* to *Trustees Not Prohibited*

Nothing in this Trust Agreement shall prohibit a Trustee from receiving any benefits under the terms of the Retirement Benefit Plan, if he is otherwise eligible for the same as a participating employee or as a beneficiary of a participating employee.

# ARTICLE V
# PARTICIPATION

1.   *Bargaining Unit Employees Entitled to Participate*

Employees in bargaining units covered by collective bargaining agreements between employers and employer associations in the printing and paper products industry and the Graphic Communications Conference of the International Brotherhood of Teamsters, or any local union, district council, joint district council, conference or other bargaining agency affiliated with, merged with, or represented by the Conference, shall be entitled to participate in this Trust Fund.

The Trustees, however, shall have the authority to decline or terminate the participation of a particular bargaining unit if (a) the bargaining parties fail to provide the Trustees with a copy of their collective bargaining agreement or if the language of the contribution provision in such agreement does not meet the requirements of the Trustees, provided that the Trustees, in their discretion, may accept a subscription agreement in lieu of, or to supplement, a collective bargaining agreement; (b) the negotiated contribution rate is lesser, or greater, than the contribution rate or rates allowable under the terms of the Retirement Benefit Plan, provided that the Trustees, in their discretion, may accept the different rate and establish different eligibility rules or benefit formulas for the bargaining unit employees affected; (c) to allow participation as requested would violate any established rule, policy, or procedure  governing participation in the Trust Fund; or (d) there exist other facts and circumstances which, in the Trustees' discretion, justify a declination or termination of participation.

2.   *Labor Organization Employees*

Employees of a participating labor organization may participate in the Trust Fund, provided that the labor organization executes a participation agreement by the terms of which it agrees to make contributions to the Trust Fund on behalf of such employees.

The rate at which the labor organization makes contributions to the Trust Fund shall not exceed the highest negotiated rate in the geographical area encompassed by that labor organization.

3.   *Non-Bargaining Unit Employees of Participating Employers*

Non-bargaining unit employees of a participating employer may participate in the Trust Fund, provided that the employer executes a participation agreement by the terms of which it agrees to make contributions to the Trust Fund on behalf of such employees. The contribution rate for nonbargaining unit employees shall be a monthly rate equivalent to that which the participating employer is required to pay for its bargaining unit employees. Contributions must be paid on all employees falling within an appropriate group as follows:

Group A—Office clerical employees. All office clerical employees at a particular establishment must be considered as a group and the employer must make contributions for all office clerical employees within such group.

Group B—Managerial employees/business agents/officers. All managerial employees, business agents and officers at a particular establishment must be considered as a

— 11 —

group and the employer must make contributions for all employees within such group. Further, no contributions shall be accepted for a managerial employee, business agent or officer group unless the employer also contributes for the remaining employees at that establishment.

Group C—Foremen and superintendents of printing department. All non-contract foremen and superintendents of the printing department at a particular establishment must be considered as a group and the employer must make contributions for all foremen and superintendents in such group.

Group D—Other non-bargaining groups. The Trustees may recognize and allow other groups of non-bargaining unit employees to participate, as they may determine.

4. *Transferred Employees*

Individual participating employees who may be transferred from a bargaining unit position to a non-bargaining unit position at a particular establishment may continue to participate in the Trust Fund, provided that the participating employer makes contributions for all such employees. The contribution rate for transferred employees shall be a monthly rate equivalent to that which the participating employer is required to pay for its bargaining unit employees.

5. *Trust Fund Employees*

Employees of the Trust Fund (if any), or of a related trust fund may participate in the Trust Fund, provided that the Trustees authorize such participation. The cost of such participation shall be chargeable to the Trust Fund or to the related trust fund.

6. *Unauthorized Participation*

The only individuals who are eligible to participate in and receive benefits from the Trust Fund shall be those employees in the bargaining units and other groups described in Sections 1, 2, 3, 4, and 5 above. It is expected that participating employers will submit contributions only on behalf of such employees. The receipt by the Trust Fund of contributions which may be submitted on behalf of individuals who are not eligible to participate shall not stop the Trustees from declining or terminating the participation of such individuals nor shall it constitute a waiver of any of the provisions of this Article or of the Retirement Benefit Plan.

7. *Sole Proprietors and Partners Ineligible*

Sole proprietors and partners are not to be considered as participating employees and shall not be eligible to participate in and receive benefits from the Trust Fund.

8. *Participation of Non-Bargaining Unit Employees*

It is intended that the participation of groups described in Sections 2, 3, 4 and 5 above (and the resulting coverage under and benefits from this Retirement Benefit Plan) will be in accordance with the non-discrimination laws contained in the Tax Reform Act of 1986 and the Technical and Miscellaneous Revenue Act of 1988 and any amendments or regulations issued subsequent thereto, to the extent such laws and regulations are applicable to this Trust Fund and the Retirement Benefit Plan. Any omissions or oversights will be resolved in accordance with the applicable laws and regulations.

— 12 —

# ARTICLE VI
# TRUSTEE RESPONSIBILITIES

1.  *General Duty—Receipt of Contributions and*
    *Administration of Retirement Benefit Plan*

It shall be the general duty of the Trustees to receive the employer contributions and any other income or assets which they may obtain and, with such, to administer the Retirement Benefit Plan.

Additionally, the Trustees shall have the specific duties set forth in this Article and such other duties as are imposed upon them by Section 302(c) of the Labor Management Relations Act of 1947, the Employee Retirement Income Security Act of 1974, and other applicable laws.

2.  *Compliance with the Internal Revenue Code*

The Trustees shall administer the Trust Fund and the Retirement Benefit Plan so that, to the extent allowed in the Internal Revenue Code, employer contributions are tax deductible and the Trust Fund is tax-exempt.

3.  *Funding Standards*

The Trustees, with the assistance of their enrolled actuary, shall establish and maintain a funding standard account, as required by Section 304(b)(l) of the Employee Retirement Income Security Act of 1974, for the purpose of determining that the Retirement Benefit Plan remains actuarially sound according to the funding standards imposed by such Act. The funding standard account shall be reviewed by the Trustees at least once each year and on occasions when the Trustees are considering amendments to the Retirement Benefit Plan which involve an actuarial cost.

The Trustees shall administer the Trust Fund and the Retirement Benefit Plan so that, to the extent such is reasonably within their control, the Plan does not accrue an uncorrected "accumulated funding deficiency", as defined in Section 304(a) of the Employee Retirement Income Security Act of 1974. If it should be determined that an "accumulated funding deficiency" has accrued or will accrue, such deficiency may be corrected by the participating employers and labor organizations, through an adjustment in the amount of contributions, or by the Trustees, through an amendment of the Retirement Benefit Plan adjusting the level of benefits.

The foregoing provision shall not be interpreted as a guarantee that the Retirement Benefit Plan will never accrue an uncorrected "accumulated funding deficiency" or as an indemnification on the part of the Trustees as to any liability which may be imposed upon a participating employer with respect to such deficiency under the applicable provisions of such Act or the Internal Revenue Code.

4.  *Basis of Payments to and from Trust Fund*

The basis on which the employer contributions are made to the Trust Fund shall be as specified in the underlying collective bargaining agreement, subscription agreement or participation agreement. The basis on which benefits are paid out of the Trust Fund shall be as specified in the Retirement Benefit Plan.

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 27
2:20-cv-02074

5.  *Application of Trust Fund Assets*

*As* required by Section 403(c)(l) of the Employee Retirement Income Security Act of 1974, the assets of the Trust Fund shall never inure to the benefit of any participating employer and shall be held for the exclusive purposes of providing benefits to participating employees and their beneficiaries and defraying reasonable administrative expenses.

6.  *Fiduciary Standards*

As required by Section 404(a)(l)(A) and (B) of the Employee Retirement Income Security Act of 1974, the Trustees shall discharge their duties and administer the Trust Fund assets solely in the interest of the participating employees and their beneficiaries and for the exclusive purpose of (a) providing benefits to participating employees and their beneficiaries and (b) defraying reasonable expenses of benefit plan administration.

In carrying out their duties the Trustees shall act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

7.  *Deposits*

The Trustees shall deposit the contributions or any other monies which they may receive, in one or more banks or similar financial institutions supervised by the United States or a state, pending the allocation of such monies for the payment of current benefits and expenses, or for investment.

8.  *Investments*

The Trustees shall invest all contributions or other monies not required for the payment of current benefits and expenses. The Trustees may invest and reinvest in bank accounts, savings and loan accounts, securities, mortgages, deeds of trust, notes, commercial paper, real estate, insurance contracts, and in such other property, real, personal, or mixed, as they deem prudent provided that in the making of investments the Trustees shall diversify such investments as required by Section 404(a)(l)(C) of the Employee Retirement Income Security Act of 1974 so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. Further, no investment shall be made which would constitute a "prohibited transaction" within the meaning of Section 406 of such Act, provided that the Trustees shall have the authority to apply to the Secretary of Labor for a conditional or unconditional exemption from any of the "prohibited transaction" rules, as they may deem necessary.

9.  *Specifically Permitted Investments*

In the event the Trustees designate one or more banks or similar financial institutions supervised by the United States or a state to serve as custodian of the trust assets, or as a corporate co-trustee, or in another fiduciary capacity, the monies belonging to the Trust Fund may be invested in the accounts of such bank or institution, provided that such accounts bear a reasonable interest rate.

Further, to the extent allowed by law, the monies of the Trust Fund may be invested in (a) a common or collective trust fund or pooled investment fund maintained by a bank or trust company supervised by the United States or a state or (b) in a pooled investment fund of an insurance company, or (c) in a group trust sponsored by a qualified investment

— 14 —

manager as that term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974, even though such bank, trust company, insurance company, or investment manager is a party-in-interest as that term is designated in Section 3(14) of the Employee Retirement Income Security Act of 1974, provided that the bank, trust company, insurance company, or investment manager receives not more than reasonable compensation for managing such an investment.

Finally, to the extent permitted by law, the monies of the Trust Fund may also be invested in certain alternative investments, including, but not limited to, REITS, private equity funds, infrastructure funds, and instruments comprising risk parity and real return strategies, subject to the investment criteria set out in Section 8 above.

10.  *Title to Investments and Other Assets*

Title and voting rights to all investments or other assets of the Trust Fund shall be maintained in the name of the Trust Fund provided that for convenience in transferring securities, title and voting rights to such securities may be held in the name of the Trust Fund's custodian bank, or of its nominee.

Except as may be authorized by regulation of the Secretary of Labor the indicia of ownership of all investments and other assets of the Trust Fund shall not be maintained outside the jurisdiction of the district courts of the United States.

11.  *Fidelity Bond*

The Trustees shall procure a fidelity bond in the amount required by Section 412 of the Employee Retirement Income Security Act of 1974 covering the Trustees, the administrative manager, and all other persons who receive, handle, disburse, or otherwise exercise custody or control of any of the funds or other property of the Trust Fund. The cost of such bond shall be chargeable to the Trust Fund.

12.  *Records*

The Trustees shall maintain records of their administration of the Trust Fund and the Retirement Benefit Plan, including records of all receipts and disbursements, all investments purchased or sold, all participating employee listings, all minutes of Trustee meetings, and all correspondence. No such record shall be destroyed except upon the specific action of the Trustees and destruction shall not be directed until a period of eight (8) years has elapsed from the date the record was created, unless some additional period is required by law.

13.  *Annual Audit*

The Trustees shall engage, on behalf of the participating employees and their beneficiaries, an independent qualified public accountant as that term is defined in Section 103(a)(3)(D) of the Employee Retirement Income Security Act of 1974 and shall authorize such accountant to conduct an annual financial examination of the Trust Fund, as required by Section 103(a)(3)(A) of such Act, and such other examinations as the Trustees may deem necessary. The cost of such examinations shall be chargeable to the Trust Fund.

A statement of the results of each annual examination shall be submitted to the Trustees for their review and, further, shall be made part of the Trust Fund's annual report.

— 15 —

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 29
2:20-cv-02074

14.  *Annual Actuarial Statement*

The Trustees shall engage, on behalf of the participating employees and their beneficiaries, an enrolled actuary, as that term is defined in Section 103(a)(4)(C) of the Employee Retirement Income Security Act of 1974, and shall authorize such actuary to prepare an annual actuarial statement as to the Retirement Benefit Plan, as required by Section 103(d) of such Act. The cost of such statement shall be chargeable to the Trust Fund.

The annual actuarial statement shall be submitted to the Trustees for their review and, further, shall be made part of the Trust Fund's annual report.

The enrolled actuary shall also be authorized to conduct an annual actuarial valuation as required under Section 304(c)(7) of such Act.

15.  *Summary Plan Description*

The Trustees shall furnish to the Department of Labor, upon request, any documents related to the employee benefit plan, including but not limited to the latest summary plan description, and any modifications or changes in the information contained in such description, as required by Section 104(a)(6) of the Employee Retirement Income Security Act of 1974.

The Trustees shall also furnish to participating employees and to each beneficiary receiving benefits copies of the summary plan description and copies of any modifications or changes in the information in such description, as required by Section 104(b)(l) of such Act.

16.  *Annual Report*

The Trustees  shall prepare and file with the Department of Labor an annual report as required by Sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 as amended. The Trustees shall also furnish a report to participating employers and the participating labor organizations within 30 days after the due date for filing of the annual report that contains the summary plan information set forth under Section 104 (d) of such Act.  In no case shall a participating employer or participating labor organization be entitled to receive more than one copy of any such document described in Section 104(d) of the Act during any one 12-month period. The Trustees may impose a reasonable charge to cover copying, mailing, and other costs of furnishing copies of the required information.

17.  *Statements of Accrued Pension Benefits*

As required by Section 105(a)(1)(B) of the Employee Retirement Income Security Act of 1974, the Trustees shall furnish a pension benefit statement at least every 3 years to each participating employee with a nonforfeitable accrued benefit and who is employed by a participating employer at the time the statement is to be furnished, and to a participating employee or beneficiary upon written request. The pension benefit statement shall indicate, on the basis of the latest information available, (a) the total benefits accrued and (b) the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which benefits will become nonforfeitable. Such statements may be delivered in written, electronic, or other appropriate form to the extent such form is reasonably accessible to the participating employee or beneficiary. Alternatively, the Trustees may comply with the requirements of Section 105 (a) (1) (B) of such Act by providing at least once a year to participating

employees notice of the availability of the pension benefit statement and the ways in which the participating employee may obtain such statement. Such notice may be delivered in written, electronic, or other appropriate form to the extent such form is reasonably accessible to the participating employee. In no case shall a participating employee or beneficiary be entitled to more than one pension benefit statement in any 12-month period.

In addition, the Trustees shall furnish to each participating employee who during the Plan Year separates from service covered by the Benefit Plan, who is entitled to a deferred vested benefit under the Benefit Plan as of the end of such Plan Year, and with respect to whom retirement benefits were not paid under the Benefit Plan during such Plan Year, a statement describing the nature, amount and form of the deferred vested benefit to which such participating employee is entitled. Such statement shall also include a notice to the participating employee of any benefits which are forfeitable if the participant dies before a certain date. The Trustees shall also file an annual registration statement with the Internal Revenue Service concerning participating employees to whom such statements have been issued, as required by Section 6057 of the Internal Revenue Code.

18.   *Pension Funding Notice*

The Trustees shall provide an annual pension funding notice to the Pension Benefit Guaranty Corporation, to each participating employee and beneficiary, to the participating labor organization, and to each participating employer. The notice shall contain the specific information required for multiemployer plans as set forth under Section 101(f)(2) of the Employee Retirement Income Security Act of 1974 and shall be provided to the applicable parties not later than 120 days after the end of the Plan Year to which the notice relates. Such notice may be provided in written, electronic, or other appropriate form to the extent such form is reasonably accessible to persons to whom the notice is required to be provided.

19.   *Income Tax Withholding and Reporting*

The Trustees (or their duly appointed custodian bank) shall annually provide each retired employee or beneficiary receiving benefits with notice of the right to elect against withholding of income tax from his pension benefits and the right to revoke such election as required by Section 3405 of the Internal Revenue Code.

The Trustees shall also furnish to each retired employee or beneficiary receiving benefits an annual statement of the benefits paid to him, as required by Section 6051 (a) of such Code.

20.   *Documents to be Examined or Furnished*

The Trustees shall make copies of (a) this Trust Agreement, (b) the latest summary plan description, (c) the latest annual report, (d) the applicable collective bargaining agreement, and (e) any other contracts or instruments under which the employee pension benefit plan is established or operated available for examination by participating employees or their beneficiaries in the Trust Fund office as required by Section 104(b)(2) of the Employee Retirement Income Security Act of 1974.

The Trustees shall upon written request by any participating employee or beneficiary, furnish to the participating employee or beneficiary a copy of (a) this Trust Agreement, (b) the latest updated summary plan description, (c) the latest annual report, (d) any terminal report, (e) the applicable collective bargaining agreement, and (f) any other contracts or instruments under which the employee pension benefit plan is established or operated,

— 17 —

as required by Section 104(b)(4) of such Act. Such copies shall be furnished within thirty (30) days of the request. The Trustees may impose a reasonable charge for such copies as may be allowed by regulation of the Secretary of Labor.

The Trustees shall also, upon written request by a participating employee or beneficiary, furnish to the participating employee or beneficiary a copy of a) any periodic actuarial report (including any sensitivity testing received by the Trust Fund for any Plan Year which has been in the Trust Fund's possession for at least 30 days, b) a copy of any quarterly, semi-annual or other financial report prepared for the Trust Fund by any Fund Investment Manager or advisor or other fiduciary which has been in the Trust Fund's possession for at least 30 days, and c) any application filed with the Secretary of the Treasury requesting an extension under Section 304 of the Act or Section 431 (d) of the Internal Revenue Code of 1986, as required by Section 101(k) of the Act subject to any limitations imposed by Section 101(k) with regard to individually identifiable information and proprietary information. Such copies shall be furnished within 30 days of the request but only one copy of any report or application may be received during one 12 month period. The Trustees may impose a reasonable charge to cover copying, mailing and other costs of furnishing copies of the information as may be allowed by regulations of the Secretary of Labor. This provision also applies to the participating employers and labor organizations.

21.  *Procedure for Establishing Funding Policy*

As required by Section 402(b)(l) of the Employee Retirement Income Security Act of 1974, the Trustees shall meet periodically with the administrative manager, enrolled actuary, independent qualified public accountant, investment manager or managers (if any), and such other Trust Fund advisers as may be appropriate for the purpose of anticipating the short and long run financial needs of the Trust Fund and of establishing an appropriate funding policy and method for the Trust Fund.

The funding policy and method shall be considered by the Trustees, or by their investment manager or managers (if any), in the management of trust fund investments.

22.  *Payments to Pension Benefit Guaranty Corporation*

The Trustees shall pay to the Pension Benefit Guaranty Corporation the plan termination insurance premiums fixed by the Corporation, as required by Section 4002(a) of the Employee Retirement Income Security Act of 1974. Such premiums shall be chargeable to the Trust Fund. Consistent with regulations issued by the Corporation, the Trustees shall have the authority to adopt a definition of a plan "participant" and to compute and pay premiums on the basis of that "definition".

23.  *Benefit Claim and Review Procedures*

The Trustees shall establish administrative procedures whereby a participating employee or beneficiary who makes a claim for benefits and that claim is denied, is notified, in writing, of the reasons for such denial including specific references to the Retirement Benefit Plan provisions upon which the denial is based, a description of any additional information which is necessary to perfect the claim and why the information is necessary, and which afford such a participating employee or beneficiary a reasonable opportunity for a full and fair review, as required by Section 503 of the Employee Retirement Income Security Act of 1974. Such procedures shall include the Benefit Claim

— 18 —

and Review Procedures for a participating employee or beneficiary as set out in Article XIII, Section 5 of the Retirement Benefit Plan

# ARTICLE VII
# ALLOCATION OR DELEGATION OF TRUSTEE RESPONSIBILITIES

1. *Allocation of Responsibilities to Committees*

The Trustees may allocate to one or more committees of Trustees all or part of the following responsibilities, with full power to act: (a) the responsibility for managing the Trust Fund investments (if not otherwise delegated to a qualified investment manager); (b) the responsibility for reviewing and determining benefit claims of participating employees and their beneficiaries; (c) the responsibility for conducting hearings and issuing determinations as provided for in Article XI, Section 3 hereof; (d) the responsibility for resolving questions or problems that may be encountered in connection with payroll auditing or employer withdrawal liability activities; (e) the responsibility for resolving questions or problems that may be encountered in connection with the collection of delinquent employer accounts; (f) the responsibility for resolving questions or problems that may be encountered in connection with the day-to-day work of the administrative manager; (g) the responsibility for reviewing the performance of the qualified investment managers (if any), and of the other persons retained by the Trustees.

In the event the Trustees elect to allocate any of the stated responsibilities they shall do so by the adoption of a motion or resolution calling for the appointment of a committee of Trustees (consisting of equal numbers of Employer Trustees and Labor Organization Trustees) and specifying the particular responsibility that is being allocated. With respect to the responsibility that is allocated, the committee shall have the powers of the full Board of Trustees. Any action to be taken by the committee shall be determined according to the voting formula contained in Article IV, Section 1 hereof. If the committee members deadlock on any matter submitted for their consideration such matter shall be referred to the full Board of Trustees for review and action.

Nothing contained herein shall in any way limit the authority of the Trustees to create additional committees for the purpose of assisting with or expediting the affairs of the Trust Fund, provided that any such committee shall be empowered only to make recommendations with respect to the matters referred to it.

2. *Delegation of Investment Responsibilities*

The Trustees may delegate all or part of their responsibilities for the management of the Trust Fund investments to one or more qualified investment managers, as that term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974, i.e., (a) an investment adviser registered as such under the Investment Advisers Act of 1940, (b) a bank as defined in that Act, or (c) an insurance company qualified to manage, acquire, or dispose of employee benefit plan assets under the laws of more than one state.

In the event the Trustees elect to delegate investment responsibility they shall do so by the adoption of a motion or resolution making the delegation to a designated investment manager(s). The delegation shall be effective when the investment manager(s) accepts the delegation and acknowledges in writing his status as a fiduciary with respect to the Trust Fund.

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 33
2:20-cv-02074

3.   *Delegation of Other Responsibilities*

The Trustees may delegate all or part of their responsibilities with respect to the administration of the Trust Fund or the Retirement Benefit Plan (except investment responsibilities) to their administrative manager or to any other person whom they may designate for such purpose.

In the event the Trustees elect to delegate a particular responsibility they shall do so by the adoption of a motion or resolution making the delegation to a designated person. The delegation shall be effective when the designated person accepts the delegation. If the delegation involves a responsibility other than one which is ministerial in nature, the designated person shall also acknowledge in writing his status as a fiduciary with respect to the Trust Fund.

4.   *Review of Performance*

In the event the Trustees elect to allocate or delegate Trustee responsibilities they shall periodically review the performance of the persons to whom such responsibilities have been allocated or delegated.

# ARTICLE VIII
# TRUSTEE POWERS

1. *General Powers*

Except as may be expressly limited by the terms of this Trust Agreement, the Trustees shall have full and exclusive authority to control and administer the Trust Fund and the Retirement Benefit Plan.

The authority of the Trustees encompasses not only the specific powers recited in the various paragraphs of this Trust Agreement but also includes the general power to do all things and take all actions, including the expenditure of Trust Fund monies, which they may deem necessary to carry out the purpose of this Trust Agreement. The Trustees may implement their powers through the adoption of appropriate motions, resolutions, or administrative rules and regulations. Unless otherwise stated in this Trust Agreement, the Trustees will serve as fiduciaries in the creation, the administration and design of the Benefit Plan hereunder and in the implementation of any action resulting from these functions or in the exercise of any other general or specific power set out in this Trust Agreement.

2. *Specific Powers Discretionary*

The recitation of specific powers in this Trust Agreement shall not be interpreted as compelling the exercise of any such power. The exercise of specific powers is discretionary with the Trustees.

3. *Benefit Plan Being Administered*

The employee pension benefit plan being administered through this Trust Fund as of the effective date of this Trust Agreement is described as the

### GCIU—Employer
### Retirement Benefit Plan

4. *Amendments to the Benefit Plan*

The Trustees shall have the authority to amend the Retirement Benefit Plan, in whole or in part, as they may determine. Such amendments may involve the rules under which participating employees and beneficiaries become eligible for pension benefits, the nature of the pension benefits to be provided, including any related benefits, and the amount and duration of such benefits.

No amendment shall be made if the same is prohibited by the provisions of the Employee Retirement Income Security Act of 1974 or the Internal Revenue Code and, if the subject matter is governed by the Act, or the Code, the amendment shall conform to the requirements of the Act or the Code.

5. *Means of Providing Benefits*

The Trustees may provide the benefits specified in the Retirement Benefit Plan, in whole or in part, directly from the Trust Fund or may contract with an insurance carrier or other legally authorized entity, to underwrite or provide such benefits.

— 21 —

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 35
2:20-cv-02074

6. *Facility of Payment*

The Trustees shall have the authority to adopt rules by the terms of which benefit payments owing to minors or incompetents may be paid instead to a person or institution providing care or other services to such minor or incompetent, even though a legal guardian ship does not exist. Benefit payments made under any such rules shall fully discharge the Trust Fund's obligation to the minor or incompetent.

7. *Administrative Manager*

The Trustees shall have the authority to retain, at the expense of the Trust Fund, an administrative manager to assist the Trustees in the administration of the Trust Fund and the Retirement Benefit Plan. Such administrative manager may be retained on a contract or salaried basis, as the Trustees may determine.

In the event the Trustees employ a salaried administrative manager they shall also have the authority to employ such additional administrative staff personnel as may be necessary.

The Trustees shall periodically review the performance of the administrative manager.

8. *Banking Services*

The Trustees shall have the authority to retain, at the expense of the Trust Fund, one or more banks or similar financial institutions supervised by the United States or a state, to perform depository or custodial services, or to serve as corporate trustee or co-trustee, on behalf of the Trust Fund.

The Trustees shall periodically review the performance of the banks which they have retained to provide banking services.

9. *Other Professional and Non-Professional Persons*

The Trustees shall have the authority to retain, at the expense of the Trust Fund, actuaries, attorneys, employee benefit plan consultants, investment managers, investment performance analysts, payroll auditors, collection agents, and other professional or non-professional persons, as they may deem necessary. Unless limited by the provisions of the Employee Retirement Income Security Act of 1974, the retention of any such professional or non-professional help may be on a contract or salaried basis, as the Trustees may determine.

The Trustees shall periodically review the performance of the professional or nonprofessional persons they have retained.

10. *Obtaining of Necessary Premises, Equipment, and Supplies*

The Trustees shall have the authority to purchase or lease suitable premises and equipment and to purchase materials and supplies, at the expense of the Trust Fund, as they may deem necessary.

11. *Insurance*

The Trustees shall have the authority to purchase policies of insurance (liability, property damage, casualty, and errors and omissions) to protect the Trust Fund and to protect themselves, their administrative manager, and their employees (if any), with respect

— 22 —

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 36
2:20-cv-02074

to their activities on behalf of the Trust Fund, as they may deem necessary. The costs of such insurance policies shall be chargeable to the Trust Fund.

Any policy of errors and omissions insurance shall contain a recourse clause as required by Section 410(b)(l) of the Employee Retirement Income Security Act of 1974, provided that nothing herein shall prevent a Trustee (or an employer, employer association, or labor organization acting on his behalf) or the administrative manager, or the Trust Fund employees (if any) from purchasing for themselves a waiver of the recourse clause or a separate policy insuring against such recourse.

12. *Borrowing Money*

The Trustees shall have the authority to borrow money for the Trust Fund, with or without security, as they may deem necessary.

13. *Reserve Funds*

The Trustees shall have the authority to maintain reasonable reserve funds, for future contingencies, as they may deem necessary.

14. *Payment of Taxes*

The Trustees shall have the authority to pay, at the expense of the Trust Fund, all real and personal taxes, and other taxes and assessments of any kind, which may be lawfully levied or assessed against the Trust Fund.

15. *Refunds of Contributions Erroneously Paid*

The Trustees shall have the authority to adopt rules by the terms of which refunds of contributions may be made to a participating employer where the employer has paid such contributions in error, as may be allowed by Section 403(c) of the Employee Retirement Income Security Act of 1974.

16. *Penalties for False or Withheld Information*

The Trustees shall have the authority to adopt rules and regulations by the terms of which reasonable penalties or forfeitures may be imposed upon participating employees or beneficiaries who (a) falsify any information requested of them in the administration of the Trust Fund and the Retirement Benefit Plan, or (b) fail to provide requested information within a reasonable time.

17. *Correction of Errors*

It is recognized and acknowledged by all parties that the Trustees will provide eligibility credits and benefits to participating employees and their beneficiaries based on Trust Fund records. It is also recognized and acknowledged that such records could be incorrect due to (a) employers reporting individuals who are not eligible for participation, (b) employers reporting incorrect names or incorrect social security numbers, (c) employers reporting more or less than the hours or contributions required to be reported, (d) delinquent employer reports, (e) employees or beneficiaries submitting incorrect or false benefit applications, (f) recording or computation errors by the administrative manager, (g) computer errors, or (h) other similar circumstances. The Trustees shall have the authority to correct the Trust Fund records whenever errors are discovered and to terminate participation, adjust eligibility credits or benefits, or seek the recovery of benefit overpayments,

— 23 —

as they may determine.

18. *Prosecution of Legal Action or Claims*

The Trustees shall have the authority to originate and maintain any legal actions, or claims involving potential legal actions, at the expense of the Trust Fund, as they may deem necessary. All such actions and claims shall be prosecuted in the name of the Trust Fund or in the name of an assignee.

19. *Defense of Legal Actions or Claims*

The Trustees shall have the authority to defend all legal actions, claims involving potential legal actions, and investigatory proceedings, initiated against the Trust Fund or against one or more of the Trustees, or former Trustees, or the administrative manager, or against one or more of the employees of the Trust Fund (if any) which relate to the administration of the Trust Fund or the Retirement Benefit Plan. Except as stated below, the defense of such actions, claims and proceedings shall be at the expense of the Trust Fund.

If the final court decree establishes personal liability on the part of specified Trustees, or the administrative manager, or the employees of the Trust Fund (if any) for breach of their fiduciary responsibilities, as permitted by Section 409(a) of the Employee Retirement Income Security Act of 1974, and orders that the specified persons are to bear the expenses of their own defense, the attorney fees and costs of the specified persons shall not be chargeable to the Trust Fund. If attorney fees and costs have already been charged to the Trust Fund, the specified persons shall be obligated to repay the Trust Fund for their pro rata share of such fees and costs.

20. *Compromise of Legal Actions or Claims*

The Trustees shall have the authority to compromise, settle, or release all legal actions, or claims involving potential legal actions, in favor of or against the Trust Fund on such terms and conditions as they may determine.

21. *Subscription and Participation Agreements*

The Trustees shall have the authority to create and distribute subscription and participation agreements, at the expense of the Trust Fund, and to insist upon the execution and filing of such agreements as a condition precedent to the acceptance of contributions.

22. *Participation in Non-Profit Educational Organizations*

The Trustees shall have the authority to participate in non-profit foundations, corporations, councils, committees, or other organizations which sponsor educational programs or provide educational materials pertaining to the administration of trust funds of this nature and of employee benefit plans. If the Trustees act to participate in any such non-profit organization, the membership or participation fees of the organization shall be chargeable to the Trust Fund.

The Trustees shall also have the authority to purchase educational materials and to provide for the attendance of the Trustees, or of their administrative manager, or of such of their employees (if any), as they may designate, at educational conferences and meetings. The costs of such materials and attendance shall be chargeable to the Trust Fund.

23. *Reciprocity*

The Trustees shall have the authority to enter into reciprocal agreements with other

— 24 —

employee pension benefit funds for the exchange of eligibility credits or monies, or for the payment of pro rata benefits, on behalf of employees who may terminate their participation in the Trust Fund and begin participation in a reciprocal trust fund, and vice-versa.

24.  *Mergers*

The Trustees may accept mergers of other employee pension benefit trust funds, maintained by participating employers or jointly by participating employers and participating labor organizations, into this Trust Fund so that individual participants in such other trust funds can become participants in this Trust Fund. To that end, the Trustees shall have the authority to negotiate and consummate appropriate merger agreements which provide for the transfer of assets and liabilities from other employee pension benefit trust funds to this Trust Fund.

Any such merger agreement shall conform to these standards: (a) the value of the retirement benefits assumed by this Trust Fund (as determined on the basis of actuarial standards approved by the Trustees) with respect to the participants of the other trust fund who had retired prior to the date of the merger agreement shall not exceed the market value (determined on the date of transfer) of the assets transferred to this Trust Fund on behalf of such retired participants and (b) the value of the aggregate current service credited to the participants in the other trust fund who had not retired as of the date of the merger agreement shall not exceed one year of current service for each $1,300 (or other amount which may be fixed by the Trustees) of market value (determined on the date of transfer) of the remaining assets transferred to this Trust Fund on behalf of such participants, after allocation for retired participants.

Any such merger agreement shall also include such requirements as may be applicable under Section 208 of the Employee Retirement Income Security Act of 1974 and under the applicable provisions of the Internal Revenue Code.

25.  *Eligible Rollover Plan Distributions*

The Trustees shall have the authority to administer direct trustee-to-trustee transfers of eligible rollover plan distributions to financial institutions selected by the participant (or spouse or former spouse). The Trustees shall also have the authority to implement any necessary procedures and policies which are required by the Unemployment Compensation Amendment Act of 1992 and any amendments or regulations issued relating thereto in order to comply with the Act and regulations.

26.  *Interpretation and Application of Documents*

The Trustees shall have the authority to interpret and apply the provisions of this Trust Agreement, or of the Retirement Benefit Plan, or of their own motions, resolutions, and administrative rules and regulations, or of any contracts, instruments, or writings which they may have adopted or entered into.

27.  Adoption and Implementation of a Funding Improvement Plan and Rehabilitation Plan

The Trustees shall have the authority to adopt and implement a funding improvement plan and a rehabilitation plan in accordance with the provisions of ERISA Section 305, should the enrolled actuary certify that the Retirement Benefit Plan is in endangered or critical status. In this regard, the Trustees shall provide the participating employers and

— 25 —

participating labor organizations with a schedule or schedules showing revised benefit and/or contribution structures which, if adopted, might reasonably be expected to allow the Retirement Benefit Plan to achieve applicable funding benchmarks (if the Retirement Benefit Plan is in endangered status) or to allow the Retirement Benefit Plan to emerge from critical status or to stave off insolvency.

If upon expiration of a collective bargaining agreement in effect at the time the Retirement Benefit Plan entered endangered or critical status, a participating employer and the participating labor organization are unable to agree on a new contract that includes benefit and/or contribution schedules necessary to allow the Retirement Benefit Plan to meet the applicable benchmarks, if the Retirement Benefit Plan is in endangered status, or to allow the Retirement Benefit Plan to emerge from critical status, or to stave off insolvency, the Trustees shall have the authority to implement the default schedule as described under ERISA Section 305(c)(1) (B)(i) (I) and Section 305 (e)(1)(B)(ii).

Nothing in this section should be construed as to limit the Trustees' authority and powers under the Trust Agreement or applicable provisions of ERISA.

# ARTICLE IX
# CONTRIBUTIONS AND COLLECTIONS

1. *Contribution Reporting Forms*

The Trustees shall create and make available, at the expense of the Trust Fund, contribution reporting forms for the use of participating employers in making their contributions.

2. *Contributions Due*

Contributions shall be made on all hours worked or paid for, as required by the terms of the collective bargaining agreement. Hours worked include overtime hours. Hours paid for generally include vacation, sick, holiday, and probationary hours, whether specifically included in the collective bargaining agreement, or not.

3. *Contribution Due Date*

All contributions shall be due by the fifteenth (15) day of the month following the month in which they accrue.

4. *Delinquent Contributions*

A participating employer shall be considered to be delinquent in the payment of contributions if he (a) fails to submit a contribution reporting form, and the contributions detailed therein, by the close of business on the due date, or (b) fails to submit contributions on behalf of all the employees for whom contributions are required under the applicable collective bargaining agreement, subscription agreement, or participation agreement, or (c) fails to properly compute the contributions according to the required contribution formula specified in the applicable collective bargaining agreement, subscription agreement, or participation agreement.

The Trustees shall undertake reasonable efforts to collect known delinquent contributions and related claims.

5. *Audit of Employer Books and Records*

The Trustees shall have the authority to audit the payroll books and records of a participating employer, either directly or through a qualified public accountant, as they may deem necessary in the administration of the Trust Fund. Such payroll audit may be undertaken pursuant to a routine payroll audit program or on a case by case basis, as the Trustees may determine.

Whenever a payroll audit is authorized, the participating employer involved shall make available to the Trustees, or the qualified public accountant designated by them, its payroll books and records. Such books and records shall include (a) all records which the employer may be required to maintain under Section 209(a)(l) of the Employee Retirement Income Security Act of 1974, and (b) time cards, payroll journals, payroll check registers, cancelled payroll checks, copies of the employer's federal, state, and local payroll tax reports, and all other documents and reports which reflect the hours and wages or other compensation of the employees or from which such can be verified (or electronic versions thereof).

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 41
2:20-cv-02074

In the event the payroll audit discloses that the participating employer has not paid contributions, as required by the applicable collective bargaining agreement, subscription agreement, or special agreement, the employer shall be liable for the costs of the audit.

6. *Liquidated Damages, Attorney Fees, Interest, and Other Charges*

It is recognized and acknowledged by all parties, including the participating employers, that the prompt and accurate payment of contributions is essential to the maintenance of an employee benefit trust fund and benefit plan and that it would be extremely difficult, if not impossible, to fix the actual expense and damage to the trust fund and plan which would result from the failure of a participating employer to pay the required contributions within the time provided.

Therefore, if an employer is delinquent in the payment of contributions by the tenth (10th) day following the contribution due date, or by such other date as the Board of Trustees may from time to time establish, the delinquent employer shall be liable, in addition, for liquidated damages of ten percent (10%) of the amount of the contributions which are owed, or twenty five dollars ($25), whichever is greater.

If the delinquent contributions or liquidated damages are not paid by the tenth (10th) day of the month following the month in which they were due, or by such other date as the Board of Trustees may from time to time establish, the account will be referred to legal counsel, or a collection agent, for collection. Upon such referral, the delinquent employer shall be liable for reasonable attorney fees and for reasonable costs incurred in the collection process, including court fees, audit fees, etc. In addition, delinquent contributions shall bear interest at the rate of ten percent (10%) per annum until paid, computed from the contribution due date.

7. *Additional Liquidated Damages in Event of Court Judgment*

In the event it is necessary to pursue a collection to a court judgment, the delinquent employer shall be liable for additional liquidated damages of ten percent (10%) of the amount of the contributions which are owed, making a total of twenty percent (20%). As provided in Section 515 of the Employee Retirement Income Security Act of 1974, as amended, the employer shall, if a judgment is entered, be obligated to the Trust Fund for the unpaid contributions, interest on the unpaid contributions, liquidated damages of twenty percent (20%), reasonable attorney's fees and costs, and such other legal or equitable relief as may be appropriate.

8. *Waiver of Charges*

The Trustees shall have the authority to waive all or part of the payroll audit costs, liquidated damages, interest, attorney fees, or collection costs, for good cause shown.

9. *Protection of Employees in Cases of Delinquency*

To protect participating employees and beneficiaries in situations where participating employees may be denied pension credits because their employer is delinquent in the payment of contributions, the Trustees shall have the authority to extend pension credits to such employees.

The extension of pension credits shall not, however, release the delinquent employer from the responsibility for payment of the contributions owed.

10.  *Coordination with Provisions in Collective Bargaining Agreements*

In the event the underlying collective bargaining agreement contains provisions relating to delinquencies that specify additional remedies, or obligate the delinquent employer to greater amounts of liquidated damages, interest, or attorney fees than those set forth herein, the Trustees, at their option, may pursue the additional remedies or impose the greater charges.

The Trustees shall not be obligated, however, to pursue the collection of delinquent accounts through the grievance-arbitration procedures (if any) provided for in the applicable collective bargaining agreement.

# ARTICLE X
# EMPLOYER WITHDRAWAL LIABILITY

1.   *Calculation and Collection of Employer Withdrawal Liability*

As provided in the Multi-Employer Pension Plan Amendments Act of 1980 (PL 96-364) (hereafter the Act), in the event a participating employer should withdraw from the Trust Fund, the Board of Trustees shall (a) determine the amount of the employer's withdrawal liability (if any), (b) notify the employer of the amount of the withdrawal liability and (c) collect the amount of withdrawal liability from the employer. In carrying out this responsibility the Board of Trustees shall apply the terms and provisions of the Act, and any regulations issued thereunder, provided, however, that the Board of Trustees may from time to time adopt alternate methods or formulae as permitted in the Act.

Sections 2, 3, and 4, set forth hereafter, have been adopted as alternates under the Act.

2.   *Determination of Amount of Unfunded Vested Benefits Allocable to Withdrawing Employer*

As allowable under 4211(a) of the Act, the Board of Trustees shall determine the amount of unfunded vested benefits allocable to a withdrawing employer in accordance with the formula set out in Section 4211(b) of the Act, and any regulations issued thereunder, with the following modifications: (a) the initial pool will be based on the December 31, 2006 unfunded vested benefit liability, reduced by the value of all outstanding claims for withdrawal liability that the Trust Fund can reasonably expect to receive for employers withdrawing before 2006, (b) the calculation of subsequent pools established for changes in unfunded vested benefits as defined in 4211(b) (2) (B) of the Act will continue to reflect the value of all outstanding claims for withdrawal liability that the Trust Fund can reasonably expect to receive for employers withdrawing before 2006, and (c) in any Plan year where the unfunded vested benefit liability at the end of the prior year is zero, the unfunded vested benefit liability allocation pools for prior years will be considered fully amortized and reset to zero.

In making such a determination, reasonable actuarial assumptions and methods shall be applied as allowable under Section 4213(a)(1) of the Act and as determined by the Fund's actuary.

3.   *Payment of Withdrawal Liability in Monthly Installments*

As allowable under Section 4219(c)(3) of the Act, the annual withdrawal liability payments owing to this Trust Fund by a withdrawing employer shall be payable in twelve equal monthly installments, due on the first (1st) day of each month, in advance.

4.   *Adoption of Administrative Rules and Regulations*

The Board of Trustees shall adopt administrative rules and regulations relating to the processing of employer withdrawal situations.

5.   *Notice of Potential Withdrawal Liability*

As provided in Section 101(1) of the Employee Retirement Income Security Act of 1974, the Board of Trustees shall, upon written request, furnish to any employer who has an obligation to contribute to the Fund (a) a notice of the estimated amount of what would

— 30 —

be the employer's withdrawal liability if the employer withdrew on the last day of the plan year preceding the date of the request, and (b) an explanation of how such estimated withdrawal liability was calculated, including (i) the actuarial assumptions and methods used to determine the value of the Retirement Benefit Plan's liabilities and assets; (ii) the data regarding employer contributions, unfunded vested benefits and annual changes in the Retirement Benefit Plan's vested benefits; and (iii) changes in the application of any relevant limitations in the estimated withdrawal liability. Such notice shall be furnished to the requesting employer within 180 days after the request but in no case shall an employer be entitled to receive more than one such notice during any one 12-month period. The Board of Trustees shall impose a reasonable charge on each employer requesting such a notice.

— 31 —

# ARTICLE XI
# BENEFIT CLAIM, HEARING AND ARBITRATION PROCEDURES

1.   *Hearings Required*

The Trustees shall afford a hearing to any participating employer, employer association, or labor organization who is aggrieved by any decision or action of the Trustees, or of the administrative manager acting on their behalf. The aggrieved party may present the appeal in person, or through a representative, or by written submission.

It shall be the obligation of any such person to exhaust the hearing procedures specified in this Article before instituting final and binding arbitration concerning any such decision or action.

2.   *Requests for Hearings*

Any person seeking a hearing shall make a request therefore, in writing, within sixty (60) days after being apprised of, or learning of, the complained of decision or action. All such requests shall be addressed to the Trustees and shall be mailed to the Trust Fund's administrative office.

3.   *Conduct of Hearings*

Upon receipt of a request for a hearing, the Trustees shall fix a date and place for a hearing. At the hearing, the complaining person shall be entitled to present his position and any witnesses or other evidence in support thereof. The complaining person may be represented by an attorney or by any other representative of his choosing. In the alternative, the complaining person may choose to present his appeal by written submission.

The Trustees shall, within thirty (30) days following the hearing, issue a written decision affirming, modifying, or setting aside the former decision or action.

4.   *Hearing Rules*

The Trustees shall have the authority to adopt rules governing the conduct of any such hearing.

5.   *Arbitration - Mandatory*

If the complaining person is dissatisfied with the written decision of the Trustees, he shall have the right to appeal the matter to mandatory, final and binding arbitration in accordance with the labor arbitration rules or the employee benefit claim rules of the American Arbitration Association, provided that he submit a request for arbitration to the Trustees, in writing, within sixty (60) days of receipt of the written decision. If an appeal to arbitration is requested, the Trustees shall submit to the arbitrator a certified copy of the record upon which the Trustees' decision was made.

The question for the arbitrator shall be (1) whether the Trustees were in error upon an issue of law, (2) whether they acted arbitrarily or capriciously in the exercise of their discretion, or (3) whether their findings of fact were supported by substantial evidence. The decision of the arbitrator shall be final and binding upon the Trustees, upon the appealing party, and upon all other parties whose interests are affected thereby. The expenses of the arbitration shall be borne equally by the appealing party and by the Trust Fund, unless otherwise ordered by the arbitrator.

— 32 —

6.  *Benefit Claim and Review Procedures for a Participating Employee or Beneficiary*

The Trustees shall provide benefit claim and review procedures for any participating employee or beneficiary who has made a claim for benefits and is aggrieved by any decision or action of the Trustees, or of the administrative manager acting on their behalf. The aggrieved party may present the appeal under the Benefit Claim and Review Procedures set out in Article XIII, Section 5 of the Retirement Benefit Plan.

7.  *Sole and Exclusive Remedies*

These Benefit Claim, Hearing and Arbitration procedures are the sole and exclusive remedies for all complaining persons.

— 33 —

# ARTICLE XII
# LIMITATIONS

1. *Liabilities and Debts of Trust Fund*

No participating employer, employer association, or labor organization, shall be responsible for any liabilities or debts of the Trust Fund. This provision, however, shall not relate to any liability that may be imposed upon a participating employer under Section 4971 of the Internal Revenue Code or Title IV of the Employee Retirement Income Security Act of 1974, as amended by the Multi-Employer Pension Plan Amendment Act of 1990.

2. *Liabilities and Debts of Participating Parties*

No participating employer, employer association, or labor organization shall, by reason of their participation in the Trust Fund, become responsible for the liabilities or debts of any other participating employer, employer association, or labor organization.

3. *Personal Liabilities of Trustees and Fiduciaries*

No Trustee or other fiduciary shall incur any personal liability in connection with the administration of the Trust Fund or the Retirement Benefit Plan, except for such liability that may be established in accordance with Section 409(a) of the Employee Retirement Income Security Act of 1974.

Except as may be required by applicable provisions of such Act, no Trustee or other fiduciary shall be held personally liable for any breach of fiduciary responsibilities in connection with the administration of the Trust Fund or the Retirement Benefit Plan where it is established (a) that the responsibilities at issue were lawfully allocated or delegated to other Trustees or fiduciaries or (b) that in carrying out the responsibilities at issue the Trustee or other fiduciary reasonably relied upon the advice given by the administrative manager or by one or more of the professional persons employed by the Trustees.

No Trustee or other fiduciary shall be personally liable for a breach of fiduciary responsibilities if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

4. *Judgments Against Trust Fund*

Any money judgment against the Trust Fund shall be enforceable only against the Trust Fund entity and shall not be enforceable against any Trustee or other person, unless liability against the Trustee or other person, in his individual capacity, is established in accordance with Section 409(a) of the Employee Retirement Income Security Act of 1974.

5. *Participating Parties' Rights*

Except as specifically provided for in this Trust Agreement or in the Retirement Benefit Plan, no participating employer, employer association, labor organization, employee, or beneficiary shall have any right, title, or interest in or to the Trust Fund, or in or to the contributions, or in or to the benefits provided.

No participating employee shall be entitled to receive any part of the contributions in lieu of the benefits provided through the Retirement Benefit Plan, nor shall a participating employee who does not qualify for benefits, or his employer, have any claim to the con-

— 34 —

tributions which may have been paid on his behalf.

6.  *Cessation of Participation*

In the event a participating employer, employer association, or labor organization, or groups thereof, should cease their participation in the Trust Fund, there shall be no division or allocation of any of the monies or assets of the Trust Fund, except as may be specified in the Retirement Benefit Plan or required by law.

7.  *Protection of Trust Fund, Contributions, and Benefits*

No part of the Trust Fund (including the contributions) or the benefits payable under the Retirement Benefit Plan, shall be subject in any manner, by a participating employee or beneficiary, to anticipation, alienation, sale, transfer, assignment, encumbrance, or charge, and any such attempt shall be null and void except as may be required under Section 206(d) of the Act, as amended (a QDRO).

Further, no part of the Trust Fund (including the contributions), or the benefits payable under the Retirement Benefit Plan, shall be liable for the debts of a participating employee or beneficiary, nor be subject in any manner to garnishment, attachment, lien, charge, or any other legal process brought by any person against a participating employee or beneficiary, and any such attempt shall be null and void except as may be required under Section 206(d) of the Act, as amended (a QDRO).

8.  *Reliance upon Written Documents*

The Trustees may act upon any written letter, report, certificate, instrument, or other document submitted to them by any participating employer, employer association, labor organization, employee, or beneficiary, or by any other person, where such document appears to be genuine and to be signed by the proper person or persons and the Trustees shall be under no duty to make any investigation or inquiry as to any statement contained in any such document.

9.  *Agents of Trust Fund*

Unless authorized in a motion or resolution of the Trustees, no participating employer, employer association, or labor organization, nor any individuals employed thereby, shall have any authority to act or function for or on behalf of the Trust Fund or as agent thereof.

Likewise, unless authorized in a motion or resolution of the Trustees, no individual Trustee or other fiduciary shall have any authority to act or function for or on behalf of the Trust Fund or as an agent thereof.

— 35 —

# ARTICLE XIII
# MISCELLANEOUS

1.  *Trust Fund Offices*

The Trust Fund shall maintain a principal office and suboffices, where necessary, in such locations as the Trustees may determine.

2.  *Applicable Laws and Regulations*

This Trust Agreement and the Retirement Benefit Plan shall be interpreted and administered in accordance with Section 302(c) of the Labor Management Relations Act of 1947, the Employee Retirement Income Security Act of 1974, the Internal Revenue Code, and the regulations pertinent thereto, and other applicable statutes and regulations, as such statutes and regulations presently exist or as they may hereafter be amended. Any omissions or oversights will be resolved in accordnce with the laws and regulations.

References herein to particular sections of the above mentioned statutes shall include any regulations pertinent to such sections and shall encompass any subsequent amendments to such sections or regulations.

3.  *Notices*

Any written notice permitted or required by this Trust Agreement shall be personally delivered to the person for whom it is intended or sent to such person, at his residence or business address, by first class mail. Any such notice may also be delivered by email, facsimile transmission, or other electronic means available as may be allowed by law.

4.  *Severability*

If any provision of this Trust Agreement, or of the Retirement Benefit Plan is held to be illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining portions of the Trust Agreement or the Retirement Benefit Plan.

5.  *Title — Words*

The titles of the various articles and sections of this Trust Agreement are inserted solely for convenience of reference and are not a part of, nor shall they be used to construe, any term or provision hereof. Whenever any words are used herein in the masculine gender they shall be construed as though they were used in the feminine gender, and words in singular form shall be construed as though they were used in the plural form, in all cases where they would so apply.

6.  *Information to be Furnished and Distributed*

To aid the Trustees in the administration of the Trust Fund, the participating employers, employer associations and labor organizations shall furnish the Trustees with such information as they may determine including (a) copies of collective bargaining agreements, (b) contribution rates, (c) the identity of employees covered by collective bargaining agreements, subscription agreements or participation agreements, and their social security numbers, (d) reports on compensated hours for all employees who have worked in the bargaining unit or as a nonbargaining unit employee whether or not a contribution has been paid, (e) reports on all hours or shifts or wages which constitute the basis of the contribution made to the Retirement Benefit Plan as provided in the collective bargaining agreement, subscription agreement or participation agreement, and (f) reports on actual contributions owed broken down by each employee.

— 36 —

# ARTICLE XIV
# AMENDMENTS AND TERMINATION

1. *Amendments*

This Trust Agreement may be amended by action of the Trustees, except that the Trustees shall make no amendment to Article III without the unanimous written consent of the Trustees and the remaining signatory parties (or their successors).

In the event that the Trustees should propose an amendment to Article III, they shall deliver copies thereof to the remaining signatory parties (or their successors). If any signatory party (or successor thereto) fails, within thirty (30) days, to respond to a written request for consent to any such amendment, that signatory party will be deemed to have waived its right to act upon such amendment.

2. *Termination*

This Trust Agreement may be terminated, at anytime, by unanimous action of the Trustees and the remaining signatory parties (or their successors).

3. *Allocation upon Termination*

If the Plan is terminated, all assets remaining in the Trust Fund after the payment of all expenses incurred in terminating or administering the Plan will be allocated to the benefit of participating employees, retired employees, and surviving spouses, according to the following order of priority:

(a)   First, the remaining assets shall be allocated equally to (1) benefits in pay status three years prior to termination at the lowest benefit level under the plan during the five years prior to termination, and *(2)* benefits which would have been in pay status three years prior to termination had the employee been retired (and had his benefits commenced then, at the lowest benefit level under the plan during the five years prior to termination.)

(b)   Second, the assets remaining after satisfying the benefits described in section (a) above shall be allocated equally to all other benefits guaranteed under Title IV of the Employee Retirement Income Security Act of 1974, (irrespective of the limitations on the amount of monthly benefits and regardless of the number of plans in which the employee participated).

(c)   Third, the then remaining assets shall be allocated equally to all other non-forfeitable (vested) benefits under the plan.

(d)   Fourth, the then remaining assets shall be allocated equally to all other benefits under the plan.

If the assets of the Trust Fund applicable to any of the above categories (a) and (b) are insufficient to provide fully the amount of the benefits in each category, the benefits otherwise payable shall be reduced proportionately.

If the assets of the Trust Fund applicable to category (c) are insufficient to provide fully the amount of the benefits in that category, the assets shall be allocated to the benefits of individuals which are described in that category on the basis of benefits of individuals which would have been described in category (c) under the Plan as in effect at the beginning of the 5-year period ending on the date of plan termination.

If the assets available for allocation under the preceding paragraph are sufficient to satisfy in full the benefits described in that paragraph, then for purposes of that paragraph, benefits of individuals described in that paragraph shall be determined on the basis of the Plan as amended by the most recent Plan amendment effective during such 5-year period under which the assets available for allocation are sufficient to satisfy in full the benefits of individuals described in the preceding paragraph and any assets remaining shall be allocated under that paragraph on the basis of the Plan as amended by the next succeeding plan amendment effective during such period.

The amount allocated under any of the priority categories listed above with respect to any benefit shall be adjusted for any allocation of assets with respect to that benefit under a prior category.

The amount allocated to each benefit shall be used to provide monthly retirement benefit payments through continuance of the Trust Fund, or through a new Trust Fund, or for the purchase of insurance annuity contracts; provided that, if the Trustees find that it is not practical or desirable under the circumstances to do any of the foregoing, they may provide for some other means of disposing of the allocations of the Trust Fund, including making payments in cash to the persons for whom such allocations have been made.

In no event shall any of the remaining monies or assets be paid to or be recoverable by any participating employer, employer association, or labor organization.

## SIGNATORY PARTIES *as of March 25, 1976*

| <u>**Labor Organization Signatory Parties**</u> | <u>***Employer Signatory Parties***</u> |
|---|---|
| International Printing & Graphic Communications Union | Seattle Post-Intelligencer (Division of Hearst Publishing Company, Inc.) |
| By                                    Sol Fishko | By                      Gerald W. Hedman |
| Title                                 President | Title              Director of Personnel & Labor Relations |
| Date                          March 25, 1976 | Date                        March 25, 1976 |
| | |
| Printing Specialties and Paper Products Unions, IP & GCU | Seattle Times Company |
| By                                    Sol Fishko | By                        Harold Fuhrman |
| Title                     President, IP & GCU | Title        Vice President & General Mgr. |
| Date                          March 29, 1976 | Date                        March 25, 1976 |
| | |
| Seattle Web Pressman Local No. 26 IP & GCU | Los Angeles Paper Box and Board Mills |
| By                          George G. Peterson | By                    William H. Kewell, Jr. |
| Title                  2nd V.P. #26 Seattle | Title                            President |
| Date                          March 25, 1976 | Date                        March 25, 1976 |
| | |
| Los Angeles Commercial Pressmen Local No. 78, IP & GCU | Bay Area Paper Box Employers |
| By                          Frank Calderone | By                        Edward H. Moore |
| Title                                 President | Title                            Secretary |
| Date                          March 25, 1976 | Date                            June 7, 1976 |
| | |
| | Printing Industries Association (Union Employers Section - Los Angeles) |
| | By                              Jerry Maras |
| | Title                        Representative |
| | Date                        March 25, 1976 |

## SIGNATORY PARTIES *as of July 1, 1984*

| | |
|---|---|
| Graphic Communications International Union (successor to International Printing & Graphic Communications Union) | Graphic Communications Union, Local No. 404-M (successor to Los Angeles Commercial Pressman No. 78, IP & GCU) |
| Graphic Communications Union No. 777 (successor to Printing Specialties and Paper Products Union, IP & GCU) | Seattle Times Company |
| Seattle Newspaper Pressmen Local No. 26, GCIU | Bay Area Paper Box Employers |
| | Printing Industries Association (Union Employers Section—Los Angeles) |

**Note:** On September 9, 1988, the three remaining employer signatory parties, the Seattle Times, the Bay Area Paper Box Employers, and the Printing Industries Association (Union Employers Section) - Los Angeles, agreed, in writing, to irrevocably and unconditionally transfer and assign to the incumbent employer trustees and their successors all of their rights and powers under this Trust Agreement and to forever resign their positions as employer signatory parties.

## SIGNATORY PARTIES *as of September 1, 1990*

Graphic Communications International Union (successor to International Printing & Graphic Communications Union)

Graphic Communications Union, Local No. 388-M (successor to Graphic Communications Union, No. 777)

Graphic Communications Union, Local No. 767-M (successor to Seattle Newspaper Pressmen Local No. 26, GCIU)

Graphic Communications Union, Local No. 404-M (successor to Los Angeles Commercial Pressmen No. 78, IP & GCU)

## SIGNATORY PARTIES *as of September 1, 1999*

Graphic Communications International Union (successor to International Printing & Graphic Communications Union)

Graphic Communications Union, Local No. 388-M (successor to Graphic Communications Union, No. 777)

Graphic Communications Union, Local No. 767-M (successor to Seattle Newspaper Pressmen Local No. 26, GCIU)

Graphic Communications Union, Local No. 404-M (successor to Los Angeles Commercial Pressmen No, 78, IP & GCU)

## SIGNATORY PARTIES *as of September 1, 2012*

Graphic Communications International Union (successor to International Printing & Graphic Communications Union)

Graphic Communications Union, Local No. 388-M (successor to Graphic Communications Union, No. 777)

Graphic Communications Union, Local No. 767-M (successor to Seattle Newspaper Pressmen Local No. 26, GCIU)

Graphic Communications Union, Local No. 404-M (successor to Los Angeles Commercial Pressmen No, 78, IP & GCU)

**LIST OF TRUSTEES** *as of January 1, 1976*

| **Employer Trustees** | **Labor Organization Trustees** |
|---|---|
| Harold Fuhrman | Sol Fishko |
| Charles Woessner | Robert O'Neil |
| Joseph Conley | Jack McCormick |
| Jerry Maras | Don McCaughan |
| Frank Hurlburt | George Peterson |
| William Kewell, Jr. | Frank Calderone |
|  | Wade Moore |
|  |  |
| **Alternate Employer Trustees** | John Millan |
| Gerald Hedman | Floyd F. Lisinski |
| Walter Taylor |  |
| O.H. Rieth | **Alternate Labor Organization Trustees** |
| Lad Sabo | George Barnett |
|  | George Gates |
|  | Cy Quinn |

**LIST OF TRUSTEES** *as of September 1, 1990*

| **Employer Trustees** | **Labor Organization Trustees** |
|---|---|
| Joseph Conley | James Western |
| Harold Fuhrman | George Barnett |
| Jerry Maras | Wade Moore |
| O.H. Rieth | Floyd Lisinski |
| Donald Scheiber | William Roberts |
| David Stanger | James Norton |
|  | Gary Dunmire |
|  | Robert Bartlett |
|  | William Clark |

**LIST OF TRUSTEES** *as of September 1, 1999*

| **Employer Trustees** | **Labor Organization Trustees** |
|---|---|
| Joseph Conley | Frank P. Young |
| Harold Fuhrman | William Clark |
| Hugh Gaylord | John A. Giannone |
| Jerry Maras | Stephen E. Northup |
| Thomas E. Phillips | James J. Norton |
| Nate Accardi | Edward A. Treacy |
| Jim Janiga | John D. Bachler |
|  | **Alternate Labor Organization Trustees** |
|  | George Osgood |
|  | Ryan Sherard |
|  | Paul E. Golden |

— 41 —

# Notes

GCIU-Employer Retirement        EXHIBIT 1 to COMPLAINT - 56
Fund, et al. v. The Marek Group, Inc.        2:20-cv-02074

GCIU-Employer Retirement Fund

AMENDMENT NO. 1
TO THE TRUST AGREEMENT GOVERNING
THE GCIU-EMPLOYER RETIREMENT FUND
(as revised and restated December 1, 2012)

This is to certify that the Board of Trustees of the GCIU-Employer Retirement Fund, at a meeting on August 20, 2013, did adopt the following amendment to Article IV, Section 2, "Constitution of a Quorum," of the Trust Agreement governing the GCIU-Employer Retirement Fund.  This Amendment is effective August 20, 2013.

Article IV, "Trust Fund Administration," Section 2, "Constitution of a Quorum," is hereby deleted and replaced with the following:

"2.  Constitution of a Quorum

To constitute a quorum at any meeting of the Trustees there must be present at least 50% of the Employer Trustees, or duly designated alternates, and 50% of the Labor Organization Trustees, or duly designated alternates."

Dated this 20th day of August 2013.

_____
Chairman

_____
Secretary

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 59
2:20-cv-02074

GCIU-Employer Retirement Fund

AMENDMENT NO. 2
TO THE TRUST AGREEMENT GOVERNING
THE GCIU-EMPLOYER RETIREMENT FUND
(as revised and restated December 1, 2012)

This is to certify that the Board of Trustees of the GCIU-Employer Retirement Fund, at a meeting on February 18, 2015, did adopt the following amendment to Article VI, Section 9, "Specifically Permitted Investments," of the Trust Agreement governing the GCIU-Employer Retirement Fund.  This Amendment is effective February 18, 2015.

Article VI, "Trustee Responsibilities," Section 9, "Specifically Permitted Investments," is hereby revised to read as follows:

"9.   Specifically Permitted Investments

* * *

Finally, to the extent permitted by law, the monies of the Trust Fund may also be invested in certain alternative investments and investment vehicles, including, but not limited to, mutual funds, REITS, private equity funds, infrastructure funds, private debt funds, and instruments comprising risk parity and real return strategies, subject to the investment criteria set out in Section 8 above."

Dated this ___10th___ day of April 2015.


_____
Chairman

_____
Secretary

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 60
2:20-cv-02074

GCIU-Employer Retirement Fund

AMENDMENT NO. 3
TO THE TRUST AGREEMENT GOVERNING
THE GCIU-EMPLOYER RETIREMENT FUND
(as revised and restated December 1, 2012)


This is to certify that the Board of Trustees of the GCIU-Employer Retirement Fund ("Fund"), at a meeting on November 17, 2015, did adopt the following Amendment to Article VI, "Trustee Responsibilities," Section 20, "Documents to be Examined or Furnished," of the Trust Agreement governing the GCIU-Employer Retirement Fund for compliance with the Multiemployer Pension Reform Act of 2014. This Amendment is effective January 1, 2015.

Article VI, "Trustee Responsibilities," Section 20, "Documents to be Examined or Furnished," is amended to delete the third paragraph in its entirety and replace it with the following:

**"20. Documents to Be Examined or Furnished**

\* \* \*

The Trustees shall also, upon written request by a participating employee or beneficiary, labor organization, or participating employer furnish to the participating employee or beneficiary, labor organization, or participating employer a copy of a) the current plan document (including any amendments thereto), b) the latest summary plan description of the plan, c) the current trust agreement (including any amendments thereto, d) the applicable collective bargaining agreement and/or participation agreement for the current Plan Year or any of the five immediately preceding Plan Years, e) the annual report for any Plan Year, f) the Trust Fund funding notice for any Plan Year, g) any periodic actuarial report (including any sensitivity testing) received by the Trust Fund for any Plan Year which has been in the Trust Fund's possession for at least 30 days, h) any

1

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 61
2:20-cv-02074

quarterly, semi-annual, or annual financial report prepared for the Trust Fund by any Fund Investment Manager or advisor or other fiduciary which has been in the Trust Fund's possession for at least 30 days, i) audited financial statements for the Trust Fund for any Plan Year, j) any application filed with the Secretary of the Treasury requesting an extension under Section 304(d) of the Act or Section 431(d) of the Internal Revenue Code of 1986 and the determination of such Secretary pursuant to such application, and k) in the case where the Trust Fund was in critical or endangered status under Section 305 of the Act for a Plan Year, the latest funding improvement or rehabilitation plan, and the contribution schedules applicable with respect to such funding improvement or rehabilitation plan (other than a contribution schedule applicable to a specific participating employer, if any), as required by Section 101(k) of the Act subject to any limitations imposed by Section 101(k) of the Act with regard to individually identifiable information and proprietary information.

In accordance with Section 101(k) of the Act, such copies shall be furnished within 30 days of the request. In no case shall a participating employee or beneficiary, labor organization, or participating employer be entitled to receive more than one copy of any document in the paragraph above during any one 12-month period, or, in the case of any document described in items (e), (f), (g), (h), or (i) of the paragraph above, a copy of any document that as of the date on which the request is received by the Trust Fund, has been in the Trust Fund's possession for 6 years or more. The Trustees may impose a reasonable charge to cover copies, mailing, and other costs of furnishing copies of the information as may be allowed by regulations of the Secretary of Labor."

\* \* \*

Executed this 17th day of November 2015.

_____
Chairman

_____
Secretary

2

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 1 to COMPLAINT - 62
2:20-cv-02074

FINAL
11/13/18

GCIU-Employer Retirement Fund

AMENDMENT NO. 4
TO THE TRUST AGREEMENT GOVERNING
THE GCIU-EMPLOYER RETIREMENT FUND
(as revised and restated December 1, 2012)

This is to certify that the current Labor Organization Trustees of the GCIU-Employer Retirement Fund did adopt the following Amendments to Article II, "Definitions," Section 12, "Signatory parties"; Article III, "The Trustees," Section 8, "Appointment of Successor Labor Organization Trustees"; Article III, "The Trustees," Section 12, "Termination of Appointment by Appointing Entity"; and Article XIV, "Amendments and Termination," Section 1, "Amendments," and Section 2, "Termination," of the Trust Agreement governing the GCIU-Employer Retirement Fund. This Amendment is effective November 13, 2018.

1. Under Article II, "Definitions," Section 12, "Signatory parties," is hereby deleted in its entirety and the remaining Sections renumbered accordingly.

2. Under Article III, "The Trustees," Section 8, "Appointment of Successor Labor Organization Trustees," is deleted in its entirety and replaced with the following:

"Article III
THE TRUSTEES

* * *

8. Appointment of Successor Labor Organization Trustees

In the event of the termination of appointment, resignation, or death of a Labor Organization Trustee, a successor Labor Organization Trustee shall be nominated by the President of the GCC-Conference of the IBT (or his named representative) and then approved/appointed by a majority of the current Labor Organization Trustees at the time of the nomination(s).

1

The GCC-Conference of the IBT shall be entitled to one Labor Organization Trustee.  In addition, only one Labor Organization Trustee shall be permitted from the same local union and/or its affiliated District Council at any time."

3.    Under Article III, "The Trustees," Section 12, "Termination of Appointment by Appointing Entity," the second and third paragraphs are deleted in their entirety and replaced with the following:

"Article III
THE TRUSTEES

* * *

12.    Termination of Appointment by Appointing Entity

* * *

The appointment of  a Labor Organization Trustee may be terminated, at any time, by a majority action of the current Labor Organization Trustees for the reasons set forth in Article III, Sections 13, 14, and 15.

The termination of a Trustee's appointment shall be effective upon the termination date specified in a written notice of termination, executed by the group of appropriate Employer Trustees or Labor Organization Trustees, as applicable.  Any such notice shall be addressed to the Trustees and shall be mailed to the Trust Fund's Administrative Office."

4.    Under Article XIV, "Amendments and Termination," Section 1, "Amendments," is hereby deleted in its entirety and replaced with the following:

"Article XIV
AMENDMENTS AND TERMINATION

1.    Amendments

This Trust Agreement may be amended at any time by action of the Trustees."

2

5.    Under Article XIV, "Amendments and Termination," Section 2, "Termination," is hereby deleted in its entirety and replaced with the following:

"Article XIV
AMENDMENTS AND TERMINATION

\* \* \*

2.    Termination

        This Trust Agreement may be terminated, at any time, by unanimous action of the Trustees."

\* \* \*

6.    All other ancillary references to the "remaining Signatory parties" and/or "Signatory party(ies) are hereby deleted and an appropriate notation will be reflected on page 40 of this Agreement.


        Executed this 13th day of November 2018 by the Labor Organization Trustees.


_____
Ralph M. Meers
as Alternate Trustee for
Edward A. Treacy
Labor Organization Trustee

_____
John D. Bachler
Labor Organization Trustee


_____
George Tedeschi
Labor Organization Trustee

3

# EXHIBIT 2

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 2 to COMPLAINT - 66
2:20-cv-02074

RECEIVED AUG 2 9 2016

# THE MAREK GROUP, INC.

#9625
pg.14

# LITHOGRAPHY

## AND

# GRAPHIC COMMUNICATIONS CONFERENCE/ INTERNATIONAL BROTHERHOOD OF TEAMSTERS

## DISTRICT COUNCIL 1 LOCAL 577-M



POSTED

# AGREEMENT



# NOVEMBER 1, 2015 THROUGH OCTOBER 31, 2018

# TABLE OF CONTENTS

SECTION 1. THE PARTIES ........................................................................ 1

SECTION 2. RECOGNITION........................................................................ 1

SECTION 3. JURISDICTION........................................................................ 2

SECTION 4.UNION SHOP ........................................................................... 2

SECTION 5. UNION AND EMPLOYER RESPONSIBILITY........................... 3

SECTION 6. MANAGEMENT PREROGATIVES-AND SURVEILLIANCE ..... 3

SECTION 7. GRIEVANCE AND ARBITRATION PROCEDURE .................... 4

SECTION 8. HOURS OF WORK................................................................... 5

SECTION 9. OVERTIME ............................................................................. 5

SECTION 10. HOLIDAY PAY ...................................................................... 7

SECTION 11. CALL FOR WORK ................................................................. 8

SECTION 12. SENIORITY............................................................................ 8

SECTION 13. TRANSFER OF SHIFTS ........................................................ 9

SECTION 14. NOTICE BEFORE LEAVING OR TERMINATION ................... 9

SECTION 15. VACATION............................................................................. 9

SECTION 16.  WAGES................................................................................ 11

SECTION 17. MANNING ............................................................................. 11

SECTION 18. APPRENTICESHIP AND TRAINING PROGRAM................... 11

SECTION 19. HEALTH & WELFARE .......................................................... 13

SECTION 20. G.C.I.U. PENSION................................................................ 14

SECTION 21.  INTER-LOCAL PENSION PROGRAM................................... 15

SECTION 22. HEALTHFUL WORKING CONDITIONS ................................. 15

SECTION 23. NO STRIKE - NO LOCKOUT - NO PICKET LINES ............... 15

SECTION 24. STRUCK WORK .................................................................... 16

SECTION 25. FUNERAL LEAVE ................................................................. 16

ECTION 26. JURY DUTY PAY .................................................................... 16

SECTION 27. SEVERANCE NOTICE .......................................................... 16

SECTION 28. DUES CHECK-OFF ............................................................... 16

SECTION 29. NEW MACHINES OR PROCESSES ...................................... 17

SECTION 30 NOT CONTRARY TO LAW..................................................... 17

SECTION 31.  AGREEMENT CONTINUITY ................................................ 17

ALCOHOL AND CONTROLLED SUBSTANCES ABUSE POLICY ............... 19

## SECTION 1. THE PARTIES

**1.1**    This Agreement is made and entered into this 19th day of December 2015, by and between The Marek Group Inc., Waukesha, Wisconsin, hereinafter called the Employer, and the Graphic Communications Conference of the International Brotherhood of Teamsters, District Council 1, Local 577-M, hereinafter called the Union. It is agreed by both parties that this Agreement shall become operative November 1, 2015 and remain in operation to and including October 31, 2018 and from year to year thereafter, providing neither party of this Agreement serves written notice on the other party of its desire to modify, amend or terminate this Agreement sixty (60) days prior to the expiration of this Agreement or any renewals thereof. The provisions of this agreement shall inure to, and be binding upon, the successors and assigns of the parties hereto.

**1.2**    This Agreement is entered into for the purpose of preventing misunderstandings between both parties; to establish a wage scale and working conditions; to prevent lockouts, boycotts and strikes; and to provide for conciliation.

## SECTION 2. RECOGNITION

**2.1**    The Employer recognizes the Union as the exclusive representative for the purpose of collective bargaining in respect to rates of pay, hours of employment or other conditions of employment for all employees performing work described in the Jurisdiction section of this Agreement.

**2.2**    The Employer agrees that during the term hereof and during any negotiations for the renewal or extension hereof or for any successor Agreement hereto, it will not sign any contract nor make any written agreement of any kind with any other Union relating to any jobs or work covered by this Agreement.

**2.3**    The Employer agrees that in the event any of the jobs or work covered by this Agreement are removed as a result of a decision initiated by the Employer in order to evade the terms of the contract, the Union may file directly for arbitration as provided in Section 7 if they allege this provision has been violated. The arbitration hearing shall be held within thirty (30) days of the receipt of the list of arbitrators. This paragraph does not apply to removal of jobs or work resulting in obtaining lithographic production work from sources outside the plant. The arbitration decision will be rendered no later than sixty (60) days from the close of the hearing.

**2.4**    Notwithstanding any of the provisions of this Agreement, the Company may, in the following circumstances, have the right to utilize temporary help to perform work in the Press Room.

Temporary help may be utilized in the event of the absence of a bargaining unit employee to perform work in the Press Room classifications, subject to the following:

     **A.**    Such temporary employee shall be an employee of the Company qualified and trained to feed the presses, and who shall be paid either at their regular rate of pay or Fill-In Feeder, whichever is higher.

     **B.**    Regular full-time employees in the Press Room will first be utilized, to the extent possible, to cover the vacancy by:

          1.    move-up from a lower classification;

*Marek Group-Litho 2018*                                                                 1

2.  transfer of employees from other equipment in the press room and subsequent move-up from a lower classification subject to business needs and customer requirements before utilizing the temporary employee.

C.  The use of temporary employees will not exceed a period of thirty (30) days for each vacancy requiring temporaries, except in the case of a temporary filling in for a medical leave of absence.  The medical leave of absence will be verified by the Company to the Union along with the anticipated duration of the medical leave of absence. If the medical leave of absence exceeds the anticipated duration for the leave, the parties will meet and mutually agree to any extended use of the temporary employee. If a non-medical leave of absence exceeds thirty (30) days, the Company will meet with the Union, disclose the anticipated additional length of the vacancy, and any additional details. The agreement of the Union will be required for any extension of the thirty (30) day period.

D.  For the purposes of this provision, the parties agree to establish the following rate of pay:

1.  Fill-In Feeder -$19.07

## SECTION 3. JURISDICTION
**3.1**     All employees performing any of the following lithographic production work, shall without limitation, be covered by the terms of this Agreement: All work, processes, and operations directly related to lithography, offset, or letterpress for purposes of printing, or otherwise reproducing images of all kinds, including any technological or other change, or evolution from any work, process, operation now or hereinafter utilized in the methods described above.

## SECTION 4.UNION SHOP
**4.1**     The Union Security (but not dues Check-off authorization) provisions (Article 4 Union Shop) of the previous agreement are of no force and effect under Wisconsin Law which provides that Union membership is voluntary; provided, however, that if the law is either declared invalid or is repealed or modified to make Union security (including any form thereof) lawful, the Union security provisions of the previous agreement will be restored in effect to the extent permitted by law.
Note: The old language regarding Union shop Section 4.1 through 4.5 will be retained in the section for reference purposes.

**4.2**     Employees will not be discriminated against by either the Union or the Company(s) by reason of their decision to exercise their right to join or to refrain from joining the Union.

**4.1**     It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing. FOR REFERENCE ONLY

**4.2**     It shall be a condition of employment that those employees covered by this Agreement who are not members of the Union on the execution date of this Agreement shall, on or before the thirtieth (30th) day following the execution date of this Agreement, apply for membership in the Union.
FOR REFERENCE ONLY

**4.3**     It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall on or before the thirtieth (30th) day following the beginning of such employment apply for membership in the Union. FOR REFERENCE ONLY

**4.4**     Any employee covered under paragraphs 4.2 and 4.3 above who fails to become a member of the Union as therein provided or to whom membership is denied because of his or her failure to tender initiation fees or dues, then within ten (10) days after written notice from the Union, the Employer shall discharge such employee. FOR REFERENCE ONLY

**4.5** If membership of any employee shall be terminated because of his or her failure to tender Union dues, then within ten (10) days after written notice from the Union, the Employer shall discharge such employee. FOR REFERENCE ONLY

## SECTION 5. UNION AND EMPLOYER RESPONSIBILITY

**5.1** The Employer agrees to inform the Union of all position vacancies in the bargaining unit and agrees to fully consider qualified applicants referred by the Union and to notify the Union if applicants so referred are not hired. The Union will have one week to provide personnel for permanent vacancy prior to the Employer going on the outside.

**5.2** The Employer agrees to notify the Union Office on a weekly basis of all new employees, permanent shift and classification changes, extended layoffs, disciplinary actions that include verbal or written warnings or layoffs, and discharges of employees within the bargaining unit.

**5.3** The parties to this Agreement agree to continue their policy of no discrimination against any employee because of race, creed, color, age, sex, national origin, veteran status, disabled, in regard to employment advancement, working conditions, rates of pay, acceptance into union membership or selection for apprenticeship openings, to the extent provided by Federal law.

**5.4** In the event any employee is selected for the purpose of representing the Union and its members at an International Convention, conference, or as a committee member, a leave of absence without pay shall be granted to such employee. This leave could be for as short as a partial day of lost time.

**5.5** The employer shall provide a bulletin board in a mutually satisfactory location for official Union notices only, provided such notices are initialed by a Union representative.

**5.6** The Union's representative shall have access to the plant at all times during working hours, for the matter of settling grievances and adjusting problems that may arise according to the terms of this agreement. The representative shall first announce himself to management or the foreman in charge before entering.

**5.7** The Union realized the delicate confidences often necessary between the management of a firm and its employees, and agrees to hold any and all private matter acquired by its members in their employment as a sacred trust not to be imparted to others or discussed outside the shop in which they are employed.

**5.8** The Union agrees that there shall be no limit put upon the output on the presses by the Union or it members.

## SECTION 6. MANAGEMENT PREROGATIVES AND SURVEILLIANCE

**6.1** Except as limited or restricted by the terms and provisions of the agreement the Employer shall manage the department and direct the working force. Management of the department includes the right to plan, direct, and control department operations, to hire, assign employees to work, transfer employees from one job to another; to promote, demote, discipline, suspend or discharge employees for just cause; to relieve employees from duty because of lack of work or any other legitimate reasons, to introduce new or improved production methods or facilities, or to change existing production methods or facilities, and the right to make and enforce posted shop rules, not inconsistent with the provisions of this agreement to carry out the functions of management.

**6.2** Surveillance and Electronic recording Equipment. The Company may use video surveillance both inside and outside any of its facilities. The purpose of the video surveillance is to promote the safety and security of employees and visitors, to safeguard company premises and property, and to protect the security of customer's product. Cameras are not used for surveillance of any particular persons, but camera footage may be accessed and used as evidence where a criminal act has occurred

and for routine or specific security purposes.  It is also understood that the use of surveillance and electronic recording equipment is not intended to be a substitute for regular day-to-day supervision. Such records may also be required by law to be provided to other parties such as a Court or the Police.

**6.3**    Employees must be notified via departmental meetings when the video surveillance goes into effect. Notices that the facilities and grounds are monitored by cameras will be posted on the property and in each facility; video locations will be posted on the Company bulletin board.

**6.4**    The Company must not use video surveillance to record or monitor the activities of employees in any of the restrooms, the locker rooms, or break rooms.

**6.5**    When an act occurs that warrants investigation, the union must be notified that video footage must be reviewed and will be given the opportunity to view it if the Company determines that any such video footage substantiates disciplinary and/or criminal action(s) against an employee or employees. The union will be given the opportunity to view the video along with one or more members of the Company's Executive Committee and/or the Human Resource Manager.  Such viewing by the Union shall be conducted prior to any decision by the Company to issue discipline or other action(s) against any employee.

**6.6**    Notwithstanding the above, the Company may use surveillance and electronic recording equipment and the resulting digital images and sound recorded by it, for any lawful purpose, including timely discipline for cause.

## SECTION 7. GRIEVANCE AND ARBITRATION PROCEDURE

**7.1**    In the event of any dispute between the Company and the Union, involving the application or interpretation of this Agreement, representatives of the Union and the Company shall seek a satisfactory adjustment of the dispute.  Any such grievance must be taken up within ten (10) business days (Monday to Friday) from the time the employee or the Union knew of or reasonably should have known of the first occurrence or the matter shall be considered closed.

**7.2**    Should no settlement result within ten (10) business days after 7.1 above then either party may submit such dispute in writing to a joint committee within ten (10) business days consisting of a representative(s) of the Company and a representatives from the Union.  Any employee involved in such dispute shall be privileged to be heard.  The Joint Committee will meet within ten (10) business days of submission of the dispute to the Joint Committee to discuss the grievance. The Union representatives shall be the Union President (or his/her designee) and a Shop Steward designated by the Union.

**7.3**    If the Joint Committee is not able to arrive at a satisfactory settlement of such dispute within a reasonable time, either party may request the matter be submitted to an impartial arbitrator to be selected by the Joint Committee. If agreement cannot be reached on the selection of an arbitrator, then a joint request will be made to the Federal Mediation and Conciliation Service to submit the names of nine (9) qualified arbitrators. Upon receipt of such list of arbitrators the parties shall alternately delete one name from the list, the person whose name remains on the list after eight (8) names have been stricken shall be the Arbitrator, provided, however, that prior to striking, each party shall have the right to reject one (1) panel.

The decision of the Arbitrator shall be final and binding on all parties and the expense of the arbitrator shall be borne equally by the Union on the one hand and the Employer on the other hand.  The Arbitrator shall be limited to the application or interpretation of the terms of this Agreement and shall have no authority to add to, delete from, or otherwise amend the terms of this Agreement.

**7.4**    In consideration of the foregoing arrangements for the adjustment of grievances or settlement of disputes, the parties to this Agreement accept these procedures as the sole and exclusive method of seeking adjustment thereof.

**7.5**    Any time limits as provided in this Section can be extended by the mutual agreement of the parties upon written request.

## SECTION 8. HOURS OF WORK

**8.1**    Forty (40) working hours in five (5) consecutive days or nights from Monday to Friday inclusive shall constitute a regular week's work, Eight (8) consecutive hours, for all shifts, shall constitute a day's work.

**8.2**    DAY SHIFT. Day hours shall be between 6:00 a.m. and 4:00 p.m. Work on a shift started and completed between these hours shall be paid for at the day rate.

**8.4**    SECOND SHIFT. A shift starting during the day and running into the night hours (later than 5:00 p.m.) shall be considered a second shift and paid for at the second shift rate for full time worked.

**8.5**    THIRD SHIFT. Any shift starting at or after 9:00 p.m. and before 6:00 a.m., except as provided herein, shall be considered a third shift and be paid for at the third shift rate for full time worked.

**8.6**    The regular starting and quitting time of all shifts shall be kept posted in a conspicuous place in each department, and any employee required to work before or after the hours so posted shall be paid for same at the overtime rate except as provided in Section 8.7. All employees must start work at the posted hours of the shift and no change may be made in such starting time except as provided in section 8.7.

**8.7**    The regular starting time of an employee may be changed to meet the necessities of business so as to require the employee to report for work not more than one (1) hour earlier than his regular shift time and in such event the starting time of the day, night, and third shifts on his equipment shall be relaxed to that extent. Any employee required to report to work more than one (1) hour prior to the regular time of his shift shall be paid double time for such time in excess of one (1) hour. The above conditions shall apply to scheduled normal shift length.

When overtime is scheduled, the starting time may be relaxed up to three (3) hours. The provisions of this section shall be applicable only if the employee shall be notified more than two (2) hours prior to the end of his previous shift.

**8.8**    When time is called, the employees must be at their appointed stations ready to work, and shall remain there and at work until the calling of time at the end of that period.

**8.9**    Sunday night 3rd shift through Thursday night 3rd shift is to be regarded as a normal work week when mutually agreeable.

## SECTION 9. OVERTIME

**9.1**    It is understood by the parties that overtime may be required. Overtime rates shall be on the following basis:

    A.    For all work performed in excess of forty (40) hours per week, or on Saturday, an employee shall receive one and one-half (1½) times their hourly shift wage. Time not worked, but paid (vacation, holiday, jury duty, and funeral leave) and unpaid time while on involuntary layoff, shall be considered as time worked for purposes of the forty (40) hour requirement.

B.    For all work done on Sundays and Holidays an employee shall receive two (2) times their shift wage.

**9.2**    If the ability to operate a specific piece of equipment on a Saturday is lost solely by the lack of qualified volunteers: then if that piece of equipment is operational on Sunday of the same weekend, the rate of pay on that specific piece of equipment will be one and one half (1-1/2) of the regular pay scale. The only exception to this rule will be: if the employee operating this specific piece of equipment worked on Saturday of the same weekend, then the rate of pay will be two (2) times the regular pay scale.

**9.3**    No employee shall be required to work more than twelve (12) hours per day. Bargaining unit employees will be offered overtime as available. No overtime is to be granted to temporary help unless regular full time qualified bargaining unit employees refuse the overtime or are unavailable to perform the work.

The Employer shall divide overtime hours as equally as practicable among all employees in a classification who are qualified and capable of performing the required work.  Overtime hours will be reviewed quarterly by the Employer and the Shop Steward when such review is requested by the Shop Steward and, where it appears that inequities have developed among employees who are qualified, capable and available for the required work, such inequities shall be corrected as equitably practicable by future overtime assignments. Overtime will be scheduled in the following manner.

General Overtime Principles: The Company will first seek volunteers for all overtime needs.  If an employee is assigned to work required overtime, he/she may switch with another qualified employee with prior supervisory approval.  If the employee is scheduled to work overtime (either he/she volunteered or he/she has been assigned to work required overtime) and the employee fails to show up or is tardy for the overtime assignment, it will be a chargeable occurrence under the attendance policy.

Overtime Procedures – Monday through Friday: For overtime needs during the workweek (Monday through Friday), the Company will seek qualified volunteers to work required overtime.  In assigning voluntary overtime, preference will first be given to employees within the affected classification who are actually performing the work, then to employees within the same classification, and finally to employees outside the class, the above based upon who has worked the least amount of overtime, provided, in each instance, they are capable and qualified to do the work. In the event that there are insufficient volunteers to meet the needs of the business, the Company may compel up to fifty percent (50%) of the available employees to work up to one (1) hour overtime per scheduled weekday. Any employee that works at least one (1) hour of overtime every weekday of a given week (Monday through Friday), will not be compelled to work for more than four (4) hours on the immediately following Saturday or Sunday.

Overtime Procedures – Weekend Coverage: Employees will be notified of the need for weekend overtime no later than the end of their shift on Thursday. For weekend overtime coverage, the Company shall also first seek qualified volunteers to work required overtime.  In assigning voluntary overtime, preference will first be given to employees within the affected classification and then to employees outside of the classification who have worked the least amount of overtime provided they are capable and qualified to perform the work.  In the event there are insufficient volunteers to perform the work, the Company may mandate employees to work first by classification and then from outside the classification if classification employees are not available, provided they are capable and qualified to perform the work.  Employees who have worked the least amount of overtime will be the first to be required to work.

Overtime shifts on a weekend shall start at six (6) a.m. for the first shift unless otherwise agreed to by the employees working such overtime. Second shift will be contiguous with the first shift and start immediately following the completion of first shift.
Mandatory weekend overtime will be limited to five (5) weekends per rolling 13-week quarter.

Each year, each employee will have two (2) opportunities to refuse to work a mandatory overtime weekend. The employee is required to notify the Company by no later than one (1) hour after the start of their regular shift on the Thursday before the weekend that he/she would like to exercise this refusal for the weekend. There will be one (1) slot available per weekend in each classification to refuse weekend overtime, and the slot will be available on a first come first serve basis. If multiple employees submit requests on the same day, the more senior employee in that classification will be awarded the refusal. In the event overtime is not needed for the weekend, the refusal will be canceled, and the employee will be allowed to exercise the refusal on an alternate weekend. Weekends falling on contractual holidays will be on a voluntary basis only.

If an employee is on an approved (not scheduled after the announcement of the need for overtime) vacation of one (1) day or more adjacent to a weekend, the employee will not be required to work that weekend (e.g. if an employee had an approved vacation day on Friday or Monday, the employee would not be required to work the "included" weekend).

If an employee has scheduled a full week of vacation (Monday through Friday), he/she will not be required to work overtime on the surrounding weekends.

**9.4**    During the month of October through Election Day in November in election years, pressmen may be required to work overtime during the week and on weekends as follows: 10 hours per weekday and 8 hours on Saturdays.

**9.5**    Not less than biweekly, the Company will post a listing of the total overtime hours by employee number so that employees may track when they may be needed to cover overtime assignments.

**9.6**    Employees called back to work shall be guaranteed two hours' work at time and one-half of their regular shift rate. A callback is understood to be: Employees who return to work at the request of management after they leave the premises at the end of their shift without being notified by management that their presence will be required again the same day.

## SECTION 10. HOLIDAY PAY

**10.1**    The word "Holiday" as used herein shall include New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, the day after Thanksgiving, the day before Christmas, Christmas Day, the day before New Year's day, and a mutually agreeable (between Employer and Employee) floating Holiday. Whenever any of said days are celebrated on other days pursuant to Federal statutes, the respective days in lieu thereof shall be considered Holidays.

**10.2**    The Holiday of the second and third shifts are part of the calendar day of the immediately preceding first shift.

**10.3**    Whenever any of the Holidays described in section 10.1 falls on a Saturday, the employer shall give a day off with pay on the Friday preceding. Whenever any of the Holidays described in section 10.1 falls on a Sunday, the employer shall give a day off with pay on the succeeding Monday. Whenever holidays fall on a Thursday and Friday in the same week, except Thanksgiving week, the Employer has the option of the Holidays being Friday along with the Monday of the following week, but only if a notice is posted in the shop two (2) week prior to the Holiday.

**10.4**    The above Holidays shall be paid to regular employees on the basis of straight time, at the employee's regular shift rate. If, however, work is performed on these Holidays, employees shall be paid Holiday pay plus two (2) times his/her regular shift rate for the regular hours worked. A regular employee shall be defined as one who has worked in the shop for three (3) full weeks immediately prior to the Holiday. An employee will not receive such Holiday pay unless he/she shall have worked the full regularly scheduled shifts before and after such Holiday. An exception to this rule will be given in the

case of excused absences, previously scheduled time off, and an employee working on the night shift of New Year's Eve.

**10.5** A regular employee absent due to illness or temporary layoff by the Employer shall be paid Holiday pay for any Holiday which falls four (4) weeks before or after such absence, except that a regular employee with ten (10) years of continuous service will receive one (1) day of holiday pay regardless of the four (4) week requirement.

## SECTION 11. CALL FOR WORK

**11.1** Employees who report for work on an assigned shift and have not been notified twelve (12) hours prior to the start of their scheduled shift that there will be no work, will be paid one half (1/2) shift if sent home without being permitted to start work. Employees reporting for work on an assigned shift other than a holiday and permitted to start work shall be guaranteed a full day's pay except in the event of the employee's own tardiness or voluntary leaving before the end of the shift. The above shall not apply when operations are interrupted for reasons beyond the control of the Employer such as: Fire, windstorm, flood, power failure, or civil commotion.

**11.2** An employee who reports for work later than the regular starting time of the shift shall be paid only for the unexpired hours of the shift.

**11.3** When an employee is temporarily laid off for an anticipated period of time and an early recall is involved, every effort will be made to encourage the employee to return to the permanent Employer. Unemployment compensation will not be contested for the period of time originally estimated.

**11.4** An employee injured on the job or in the performance of the employee's duties and requiring emergency hospitalization or other medical attention, the employee will receive a full shifts pay for that day.

**11.5** Employees called back to work after leaving the shop shall be guaranteed a minimum of three (3) hours at time and one-half (1 1/2) the regular scale plus ten dollars ($10).

## SECTION 12. SENIORITY

**12.1** Seniority shall be established on the basis of card classification in a department. Seniority shall determine shift preference. Upon two (2) weeks written notice to the Employer, employee(s) shall be entitled to exercise shift preference within their classification, using classification seniority. Employees shall only be able to change shifts once during a twelve (12) month period, unless mutually agreed upon by the affected employees and the Employer. A current seniority list shall be posted in the shop at all times.

**12.2** When it becomes necessary for the Employer to decrease the working force among the employees, due to lack of work or change in type of work available, the employee with the lowest seniority in card classification shall be laid off first.

**12.3** Competency in the judgment of the Company shall be the determining factor in temporary layoffs. However, any employee laid off out of seniority and claiming competency, shall have the right to appeal in accordance with the 'Grievance Procedure".

**12.4** During periods where layoffs occur no employee may be temporarily elevated to a classification for assignment where a layoff exists within that classification without first offering that work to a laid off employee.

**12.5** During periods of full employment in a pressroom, an employee may be temporarily elevated to a higher classification based upon his/her seniority and capability in the Company's judgment and shall receive the pay of the higher classification.

*Marek Group-Litho 2018*      8

GCIU-Employer Retirement Fund, et al. v. The Marek Group, Inc.

EXHIBIT 2 to COMPLAINT - 76
2:20-cv-02074

12.6    Should there be an increase in the work force within twelve (12) months, the person or persons laid off shall be reinstated in reverse order before other help may be employed.

12.7    In the event of permanent vacancies or new positions, the most senior employee in the next lower classification who has the capabilities in the Company's judgment shall receive such position. Management shall maintain a separate seniority list for First Pressmen, with the union steward being notified of any changes, based on when the individual started in his/her position. This list will be kept to determine seniority for future openings and shift preference only. Upon entry into a First Pressman status, he/she will become junior on the First Pressmen seniority list and begin to establish seniority as a First Pressman. Established card classification seniority will not be affected by this paragraph. All previous refusals for advancement prior to March 31, 2002 will not apply.

12.8    In the event of permanent layoffs, seniority within the bargaining unit will determine layoffs. Pressmen, and Second Pressmen, will have the option of down grading if they so choose, providing they are competent in the judgment of the foreman in order to maintain future employment.

12.9    Employees shall lose seniority and status as an employee if they: (1) Resign; (2) are discharged for cause; (3) have been laid off for a period equal to their seniority or for one (1) year, whichever is less; (4) fail to report to work when recalled from a layoff; (5) fail to report to work after the expiration of a leave of absence; (6) retire; (7) absence for more one (1) year by reason of accident or illness.

## SECTION 13. TRANSFER OF SHIFTS
13.1    Where there are multiple shifts the Company shall have the right to transfer employees from shift to shift, at his discretion at such time as it may be necessary. Provided, however, employees shall be transferred by mutual consent or according to, seniority standing in the shop.

13.2    When a new opening arises the journeyman with the highest seniority can claim the opening. If no journeyman claims the opening, in order of seniority, the Company may appoint a journeyman in that classification of work using the reverse order of seniority. Such seniority transfers shall not hamper the operation of the Employer. No employee shall be transferred more than once during the regular work week, unless by mutual consent or according to seniority in reverse order. An employee temporarily raised in another classification shall be considered the least senior in that classification.

## SECTION 14. NOTICE BEFORE LEAVING OR TERMINATION
14.1    The Union agrees that its members shall not leave the service of the shop until after the expiration of at least one (1) week's notice, which has been given to the Employer.

14.2    It is also agreed that the Employer shall not terminate a regular employee's employment until after the expiration of at least one (1) week's written notice. In lieu of one (1) week's written notice, an employee shall receive one (1) week's pay. For the purpose of this section only, this shall not apply to temporary employees (employed less than thirty (30) days) or an employee discharged for just cause or for breach of contract.

## SECTION 15. VACATION
15.1    Consistent with the business needs of the Company, vacations will be granted when most desirable to the employee. The Employer agrees to grant vacations with pay to employees on January 1st of the vacation year as follows:

   A.  To any employee who shall have been regularly employed (ordinary routine layoffs or absences disregarded) for a period of one (1) year prior to January 1st of the vacation year, two (2) weeks of vacation at his/her regular shift rate.

B.  In the event that an employee does not have full vacation credits coming he/she shall be entitled to one (1) day with pay for every five (5) weeks of employment prior to January 1st but in no event shall said vacation exceed ten (10) days for one (1) year.

C.  To any employee who shall have been regularly employed for a period of four (4) years or more prior to January 1st of the vacation year, three (3) weeks of vacation at his/her regular shift rate.

D.  To any employee who shall have been regularly employed for a period of ten (10) years or more prior to January 1st of the vacation year, four (4) weeks of vacation at his/her regular shift rate.

**15.2**   All vacations shall be given by seniority standing. The Company shall be the judge as to how many employees shall be scheduled for vacation in any given time.

**15.3**   Vacations of one (1) day to two (2) weeks are to be consecutive unless otherwise mutually agreeable and are to be granted between May 1st and October 31st except where another date may be mutually agreeable. Employees who are eligible for a third or fourth week of vacation shall take the third or fourth week of vacation either between January 1st and April 30th or between November 1st and December 31st, except where another date may be mutually agreeable. Upon completion of the first round of summer selection date picks, a second round can then occur. Vacations shall be selected by March 1st. Vacations are not cumulative and all vacations are to be taken within the calendar year.

**15.4**   When a paid holiday falls within the vacation week, the employee shall receive paid holiday allowance as provided for in Section 10, in addition to his/her vacation pay, or another day off at a mutually agreeable time.

**15.5**   Vacation credits shall be deemed money earned and shall be paid to any employee upon termination of employment unless employee is discharged for misconduct or for breach of contract or quits without giving sufficient notice as provided in Section 17, but in no event shall the penalty be more than one (1) week's vacation pay. In the event of death, said credits shall be paid to the deceased employee's immediate family.

In the event of separation or death the following credits apply:

a.  Employees entitled to less than two (2) weeks of vacation, one (1) day for every five (5) weeks of employment with a maximum of ten (10) days.

b.  Employees entitled to two (2) weeks of vacation, one (1) day with pay for every five (5) weeks of employment, with a maximum of ten (10) days.

c.  Employees entitled to three (3) weeks of vacation, one and one-half (1-1/2) days with pay for every five (5) weeks of employment, with a maximum of fifteen (15) days.

d.  Employees entitled to four (4) weeks of vacation, two (2) days with pay for every five (5) weeks of employment with a maximum of twenty (20) days.

**15.6**   Subject to approval of the Company, an employee eligible for three (3) weeks of vacation pay may forego one (1) week of vacation.  An employee eligible for four (4) weeks of vacation may forego two (2) weeks of vacation and shall receive vacation pay for the period of vacation waived in addition to the wages earned during such period.  Typically, no more than three (3) employees will be permitted to cash-in vacation in a given week.  Upon making the election, he/she will not be eligible for vacation without pay during his/her anniversary year without Company approval.

## SECTION 16.  WAGES

**16.1**  The following is the scale of wages:

| SCALE OF WAGES | Eff. 11/1/2015 | Eff. 11/1/2016 | Eff. 11/1/2016 |
|---|---|---|---|
| Cylinder | $20.93 | $21.35 | $21.78 |
| Two color/Quick Master 18" hired before 4-1-99 | $18.48 | $18.85 | $19.23 |
| Two color/Quick Master 18" hired after 4-1-99 | $15.00 | $15.30 | $15.61 |
| One color 140 | $22.49 | $22.94 | $23.40 |
| Two color 240 | $23.46 | $23.93 | $24.41 |
| Six color 620 * and ** | $26.62 | $27.15 | $27.69 |
| Six color 640 Short * | $26.62 | $27.15 | $27.69 |
| Six color 640 Long * | $26.62 | $27.15 | $27.69 |

| | Eff. 11/1/2015 | Eff. 11/1/2016 | Eff. 11/1/2016 |
|---|---|---|---|
| Second Pressman * All existing second pressman on the date of ratification. | $22.20 | $22.64 | $23.09 |
| Note: Existing second pressmen as of the date of this Agreement, who are unwilling or unable to meet the requirements of a second pressman will be grandfathered at the rate of $21.20 per hour | $21.20 | $21.62 | $22.05 |
| * $0.50 per hour above scale when running more than four (4) units ** Up to 29" First Pressman - additional $0.50 per hour premium when tower coating unit is used. | | | |

**16.2**  The premium for working second shift shall be fifty cents ($0.50) per hour.
The premium for working third shift shall be one dollar ($1.00) per hour.

## SECTION 17. MANNING

**17.1**  The Employer may, in addition to the minimum manning, use as many pressmen, as he desires in order to get and maintain the press in operation, provided the established scale of wages is paid, and provided none of the regular crew is laid off as a result of this action.

**17.2**  Only employees in the bargaining unit shall be permitted to perform operations covered by this agreement.

**17.3**  Presses shall be manned as below, unless otherwise noted in section 17.

| COMPLIMENT OF PERSONNNEL ON PRESSES | First Pressman | Second Pressman |
|---|---|---|
| Letterpress | 1 | -- |
| Two color/Quick Master 18" | 1 | -- |
| One color 140 | 1 | -- |
| Two color 240 | 1 | -- |
| Six color 620 | 1 | -- |
| Six color 640 Short | 1 | 1 |
| Six color 640 Long | 1 | 1 |

## SECTION 18. APPRENTICESHIP AND TRAINING PROGRAM

**18.1**  A Joint Apprenticeship Committee composed of three (3) representatives of the Employer and three (3) representatives of the Union shall have jurisdiction over all provisions of these agreement-affecting apprentices. They shall have control of, and be responsible for the adoption of standards for the selection of apprentices, qualification of Employers, related school training, and on-the-job training

schedules. All apprentices shall be indentured with the Wisconsin State Department of Industry, Labor and Human Relations and with the GCC/IBT.

**18.2**   Term of Apprenticeship. For pressman, full term of apprenticeship, four (4) years, including six (6) month probation period.

**18.3**   Ratio of Apprentices:

| Pressmen | | Apprentices |
|---|---|---|
| 3 | to | 1 |
| 7 | to | 2 |
| 11 | to | 3 |
| 15 | to | 4 |

**18.4**   Ratio of Apprentices for Presses Smaller than 18":

| Pressmen | | Apprentices |
|---|---|---|
| 2 | to | 1 |

All Small Offset or Assistant Apprenticeships shall be for a period of three (3) years, with the scale starting at 70% (5% every six (6) months thereafter).

If an Apprentice is to advance at a faster rate than 5% every six (6) months, it will be done upon the recommendation and discretion of management.

**18.5**   Wage Progression – Apprentices:
The rate of pay for apprentices shall be based on the applicable wage scale.

> Pressmen
> 1st 6 months - 60% of journeyman scale
> 2nd 6 months - 65% of journeyman scale
> 3rd 6 months - 70% of journeyman scale
> 4th 6 months - 75% of journeyman scale
> 5th 6 months - 80% of journeyman scale
> 6th 6 months - 85% of journeyman scale
> 7th 6 months - 90% of journeyman scale
> 8th 6 months - 95% of journeyman scale

No current employee will be reduced in pay as a result of accepting an apprenticeship, but will sustain current rate until increases are justified by regular apprentice pay progression.

**18.6**   No apprentice shall be allowed or required to work more days per week or more hours per day than journeymen are required or allowed to work.

Temporary layoffs of apprentices shall be in the same ratio as in paragraph (c) of this section for the duration of the original apprenticeship period only.

Shift assignment during apprenticeship period can be designated to a certain shift for a period of time not to exceed one year during the original program of an apprenticeship period. Apprentices should get exposure on all shifts and equipment.

Apprentices shall be given the same protection as journeymen, and shall be governed by the same shop rules, working conditions and hours of labor.

At no time shall an apprentice have charge of a department or supervision over a journeyman pressman or an apprentice pressman.

No apprentice shall be made or classified a journeyman until he/she has received his/her certificate from the GCC/IBT.

No apprentice shall leave one Employer and enter the services of another Employer without the written consent of his/her first Employer and the consent of the Joint Apprenticeship Committee.

At the completion of the apprenticeship period and upon promotion to journeyman status, the apprentices shall be placed at the bottom of the seniority list of his/her card classification.

**18.7** When an apprentice or trainee is eligible for a six (6) month periodic wage adjustment, the Union will meet with management for an evaluation and review of the candidate. This paragraph shall not take away management's final determination of progress, but is intended to supply input for that determination.

## SECTION 19. HEALTH & WELFARE

**19.1** Effective November 1, 2015 through October 31, 2016 the employer will contribute one thousand one hundred eighty-six dollars and eight cents ($1,186.08) per month to the Fund for all employees covered by this agreement. This amount represents an employer contribution of 90% with the employees paying 10%.

Thereafter, the premium increases (if any), will be shared on an 80% employer/20% employee basis of any increase up to five percent (5%) per year for the duration of this Agreement. Any increase above five percent (5%) per year will be the responsibility of the employees.

**19.2** Employer Contribution:
New employees - first billing date after thirty (30) continuous calendar days of employment.

Part-time employees - first billing date after three hundred (300) hours employment in a three (3) month period. If an employee regularly splits his/her time between two Employers, the administrator will arrange an alternating billing arrangement.

Transferred employees from one covered Employer to another covered Employer - first billing date after date of transfer if the employee transfers within thirty (30) days, otherwise the new employee provision would prevail.

Termination: Voluntary quit, Retirement or discharge - the Employer pays the premium for the month in which last worked. It being understood that coverage shall cease as of the last day worked. Vacation time is counted for eligibility.

Layoff - the Employer pays the premium for the month in which the layoff occurs plus the following month.

Work connected and non-work connected disability – The Employer will pay the premium for the month in which a non-work disability commences plus the following month. The Employer will pay the premium for the month in which work-connected disability commences plus the following three (3) months.

a. The employee will pay the premium for the next succeeding three (3) months.

b. The employer will pay the monthly premium for the next succeeding three (3) months following (a) above, provided, however, that he shall not be required to make these payments in the event that the employee allows the coverage to lapse, becomes ineligible by accepting employment with another Employer or becomes covered by another group plan.

**19.3**    If, at any time the employer's contribution is not sufficient to cover the premium due, then the employee shall be responsible for the difference through payroll deduction. Any premium share by an employee shall be on a pretax deduction.

**19.4**    The employees covered under this agreement may elect not to take medical coverage if they provide evidence of insurability to the company. These employees who have "opted out" of all coverage will not be responsible for any payroll deduction to cover shortfalls in the insurance coverage. This will be available on a first-come, first-serve basis to a maximum of 15% of participants of all the employees covered by the fund.

The Employer will make the C.B.A. monthly contributions to the Milwaukee Printing Pressman's Health & Welfare Plan for all members covered by this C.B.A. including members who opt out of the coverage of this plan.

**19.5**    Monthly adjustment to premium payments:
For those employees opting out of health insurance coverage, the Employer agrees to each opt out employee, a reimbursement fee of two hundred dollars ($200.00) per month. This reimbursement fee will be credited back to the contributing Employer on the Employer's monthly remittance report by the Plan Administrator on an on-going monthly basis.

The cost of Short Term Disability coverage and Term Life Insurance shall be deducted from the employer's contribution before credits are given back to the employer.

The balance of the Employer's monthly contribution, for members opting out of the "PLANS" coverage, will be divided and credited back to the Employer, less the cost of the coverage for short term disability and life insurance for opt-out employees (as described in the previous paragraph).

**SECTION 20. G.C.I.U. PENSION**
**20.1**    The Employer and the Union hereby accept, ratify and become bound by the terms of that certain Trust Agreement and retirement Benefit Plan, dated October 1, 1955, as amended, establishing the G.C.I.U. - Employer Retirement Fund, the same as though they were signatory parties hereto.

**20.2**    For each employee covered by this agreement, the Employer shall contribute to the G.C.I.U. - Employer Retirement Fund a monthly payment of:

Effective April 1, 2012 the Employer agrees to contribute $7.50 per shift, for all shifts worked, Monday through Sunday.

**20.3**    Any employee reporting for work shall be entitled to a full shift payment for that day. Pension payments shall be paid for all vacation days, including those paid upon job termination.

**20.4**    When a monthly copy of the pension report is completed by the Employer, it shall be shown to the Union designee to check for the number of shifts credited for each employee.

**20.5**    Effective upon written notice given to the Union and the Employer Retirement Fund (ERF) The Company may withdraw from participation in the ERF subject to participation in the ILPF as follows:

Upon written notice given to the Union and the Fund, to withdraw from the Employee Retirement Fund (ERF), and upon withdrawal from the above fund, the Company's 401(k) Savings Plan (Profit Sharing and Employer Match) will be made available to employees in the same manner as it is available to other Company employees, except as provided below.

A.    Employees covered by this Agreement at the time of withdrawal will not be subject to any length of service requirement for receipt of the Company match and will receive the Company match at the then-current maximum level.

B.    Employees covered by the Agreement at the time of withdrawal will be immediately vested in any Company matching contributions at such time the contributions are made. Subsequent new hires will be required to meet vesting requirements.

C.    Effective for the first 12 months following withdrawal the Company will contribute on behalf of employees on the seniority list as of the date of withdrawal an amount equal to a fixed $7.50 per shift for all shifts worked, Monday to Sunday, in lieu of a match of employee contributions. In the second and third 12 months following withdrawal said contribution will be $3.75 per shift. Thereafter affected employees will be eligible for normal participation in the Company 401(k) plan. It is understood that in the event this contract expires prior to the expiration of this 36 period the company will honor its commitment regarding said payments. New hires following the date of withdrawal will be eligible for normal participation the Company 401(k) plan.

D.    In the event the Company considers any modification to the Company 401(k) Savings Plan detailed above, it will advise the Union prior to any such Plan modifications and will, if requested, meet with the Union to discuss such proposed changes to consider the impact on bargaining unit employees.

## SECTION 21. INTER-LOCAL PENSION PROGRAM

**21.1**    Pursuant to payroll deduction authorizations signed by the employees, the Employer agrees to withhold from employee's gross weekly wages an amount established in writing by the Union, and to forward such amount so withheld on a monthly basis to the Trustees of the Local 577M Pension Fund upon a receipt of an assignment from the employee, along with an appropriate report form to permit proper credit to the employee's account in the Fund.

Wages withheld and paid separately under any of the above options shall be forwarded or paid within ten (10) working days from the month or week for which they were withheld. If the Employer is in default in forwarding or paying wages as provided in this section he shall be liable for and agrees to pay such legal, court and/or other costs incurred in collection proceedings. Further, any such Employer in default under this section shall be required to pay direct the employees such pension fund withholdings by separate check at the same time the balance of employees' wages are due and payable. Further, the Union shall, in its discretion have the right to terminate this Agreement, in whole or in part, as to such Employer in default, by notice in writing to the Employers.

## SECTION 22. HEALTHFUL WORKING CONDITIONS

**22.1**    The Employer agrees to furnish at all time a healthful, sufficiently ventilated, properly heated and well-lighted place for the performance of all work done in the pressroom.

**22.2**    A Committee shall be appointed to aid management in observing health and safety requirements. Management agrees to furnish and disclose contents of chemicals or material used by the employees as provided by the manufacturers.

## SECTION 23. NO STRIKE - NO LOCKOUT - NO PICKET LINES

**23.1**    It is agreed that on the part of the Union during the term of this agreement, there shall be no strike, walkout, or concerted slowdown of work, and on the part of the Employer, no lockout. No employee will be required to cross a picket line established because of an authorized strike of the Union.

**23.2**    If overt acts of violence jeopardize the employee's well being, he/she shall not be required to cross the picket line of any Union.

*Marek Group-Litho 2018*                                    15

**23.3**    The Employer shall not in any way discipline an employee for exercising his/her rights under this section.

## SECTION 24. STRUCK WORK
**24.1**    The Employer agrees that it will not require its employees to perform, and will not discipline or discriminate for failure to perform, printing work on any job received from a printing establishment where a strike exists authorized by GCC/IBT under circumstances which would make the Employer an ally of the struck Employer.

**24.2**    In the event that the company has any work in progress at the time such authorized strike is called by the GCC/IBT, the company shall complete any and all work in progress without interference by its employees or the Union.

## SECTION 25. FUNERAL LEAVE
**25.1**    In the event of a death in the immediate family (including and limited to father, mother, step-father, step-mother, spouse, son, daughter, stepson, stepdaughter, father-in-law and mother-in-law of a regular employee, he/she shall be granted three (3) days of shift pay. to attend the funeral or to attend to compelling personal matters arising out of such death and the loss of a working shift is incurred. Such time off is not required to be contiguous with the date of death or the funeral itself. Two (2) days shall be granted under the above conditions in the event of the death of a brother or sister or grandchild. One (1) day shall be granted under the above conditions in the event of the death of grandparents, brother-in-law or sister-in-law of employee (an employee's brother's or sister's spouse and an employee's spouse's brother or sister).

## SECTION 26. JURY DUTY PAY
**26.1**    A regular employee (one who has worked in the shop three (3) full weeks prior to being called) required to be absent from his/her employment to serve on a jury shall be paid his/her regular wages for normal, regular straight-time shifts up to the maximum of ten (10) shifts per year, minus any jury fees received for such shifts if he/she is required to be absent.

**26.2**    Such absence shall be supported by a statement signed by the clerk of court verifying the date and time of jury duty served. Whenever any regular employee on such jury duty is excused from such service by the court for at least one-half (1/2) day, he/she shall report back to the office and complete the balance of his/her scheduled shift. The office may, at its option, request the court to excuse the employee from services as a juror. In order to qualify for jury pay, the employee must notify his/her foreman within one (1) week upon receiving his/her summons for duty as a juror.

**26.3**    This section shall not apply when an employee volunteers for jury duty.

## SECTION 27. SEVERANCE NOTICE
**27.1**    Whenever the closing, merger, or sale of a plant results in loss of employment to any employee covered by this agreement, with one (1) year or more continuous service immediately prior to such closing, merger, or sale, he shall receive four (4) weeks' notice prior to termination of employment, in lieu of four (4) weeks of severance pay.

## SECTION 28. DUES CHECK-OFF
**28.1**    The Employer agrees that upon receipt of written authorization, the Employer will deduct Union membership dues, initiation fees or other fees, excluding fines, in the amount specified by the Union and transmit same to the Union monthly using Union provided forms. When there are insufficient funds available from the employee's pay from the first pay period of each month for full dues in said pay period, current dues and arrearages will be deducted the following month. Such authorization shall not be revocable for a period of one (1) year or until termination of this agreement, whichever is earlier and the revocation shall not be effective until ten (10) days after the written notice has been given to the employer. Provided however that such authorization maybe revoked or modified upon ten (10) days

notice to the employer in the event the rate of dues of an employee changes because of a change in compensation or because of a change in the amount of regular dues enacted by the Union.

## SECTION 29. NEW MACHINES OR PROCESSES
**29.1**   The Employer agrees that in the event of the installation of new or improved machines or processes for lithographic production work, such machines or processes must be operated by bargaining unit member(s) covered under this Agreement and under a scale of wages and conditions of work agreed upon by a joint committee of four (4) members, each party hereto choosing and appointing two (2) members thereof. Unless otherwise agreed, the wages whenever finally adopted shall be retroactive to the day of beginning of operation of such equipment or processes.

**29.2**   Furthermore, the Employer agrees to give the Union thirty (30) days' notice where practicable in writing prior to the installation of any such equipment or adoption of new processes and during such thirty (30) days to meet with the Union at any time upon request for consideration of the manning of such machines or handling of such processes, the conditions of work and any other matter relating thereto.

**29.3**   The Employer agrees that it will not change its present methods of lithographic production or other manufacturing operations historically performed by bargaining unit employees before giving thirty (30) days' notice where practical of such proposed change to the Union in order that the parties may meet to consider whatever other related changes are required.

**29.4**   In the event the committee referenced in Section 29.1 is unable to reach an agreement, then any issue unresolved shall be handled in accordance with the procedure outlined in section 7 – Grievance and Arbitration Procedure.

## SECTION 30 NOT CONTRARY TO LAW
**30.1** It is agreed that if any part or section of this agreement is declared illegal or inoperative by a court or governmental authority of competent jurisdiction, the balance of this agreement shall continue to be effective.

## SECTION 31.  AGREEMENT CONTINUITY
**31.1**   The Employer agrees that it shall give written notice of this Agreement and of all the clauses contained herein to any prospective purchaser, transferee, lessee, or assignee.  The Employer agrees to notify the Union not later than the effective date of any purchase, transfer, lease, merger or assignment of the Employer's business.

**IN WITNESS WHEREOF**, we have hereunto set our hands and seals.

**THE MAREK GROUP, INC.**

Frank Marek, CEO

**DISTRICT COUNCIL 1 GCC/IBT, Local 577-M**

Perry Ketner, President

Mick Maramonte, Vice President

**UNDERWRITTEN:**
This agreement has been made with the consent and approval of the Graphic Communications International Union, which undertakes to guarantee the fulfillment of the conditions hereinbefore set forth, except that the Graphic Communications International Union assumes no liability hereunder for the work stoppages or breaches of this contract unless said Graphic Communications International Union actually authorizes, ratifies and actively participates in said work stoppages or breaches of this contract.

Date Approved

President, Graphic Communications Conference/IBT

*Marek Group-Litho 2018*

18

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 2 to COMPLAINT - 86
2:20-cv-02074

## ALCOHOL AND CONTROLLED SUBSTANCES ABUSE POLICY

The Marek Group has a strong commitment to providing a safe, healthy and productive work environment. To that end, it is the company's goal to achieve a drug-free workplace. The abuse of drugs and alcohol could create a variety of workplace problems, including increased injuries on the job, increased absenteeism, increased financial burden on health and benefit programs, decreased employee morale, decreased productivity and a decline in the quality of products and services.

Definitions

The Marek Group believes that employees who engage in the sale, use, possession or transfer of illegal drugs or controlled substances either on the job or on company property; offer to buy or sell such substances on the job or on company property; are under the influence of drugs or alcohol while on duty; or abuse prescribed drugs on the job or on company property have directly violated company policy and will be subject to disciplinary action, up to or including termination of employment for the policy violation.

1. Prescribed Drug Use: This includes the use of legally prescribed drugs by a licensed medical professional and over-the-counter drugs that may impair safety and/or job performance. If an employee is taking any drug, it is the employee's responsibility to check with his/her health care provider for possible effects on safety or performance of the essential functions of his/her job. Any concerns should be discussed with the supervisor prior to the start of the workday.

2. Illegal Drug and Alcohol Use: This includes, but is not limited to the use of:
   - Drugs which are illegal under all circumstances.
   - Prescription drugs which have not been legally prescribed or are not being used pursuant to a physician's order. (This includes prescription drugs obtained from others.)
   - Reporting to duty under the influence of alcohol, using alcohol while on duty or misusing alcohol while off duty which results in an adverse effect on an employee's ability to do his/her job.

Training Program

Supervisor Training: All supervisors will be required to receive appropriate training to recognize the signs of drug use and alcohol misuse and the steps to follow when drug or alcohol use is detected.

Testing

The Marek Group will test all employees using urine and/or blood tests, following the DOT guidelines on specified collection and chain of custody procedures, as indicated below. A union steward must be notified at the time of a Reasonable Suspicion and/or Post Accident collection of any specimen from an employee and may accompany the employee to the collection facility, if available at the time the employee is being transported to the collection facility.

1. Pre-employment: After an offer of employment is made, but prior to employment, all prospective employees will be required to be tested for the presence of drugs. All offers of employment will be contingent upon successful completion of the pre-employment screen. Any candidate who fails the pre-employment drug screen will be ineligible to re-apply with the Marek Group for six months.

2. Reasonable Suspicion: An employee will be tested when he/she exhibits signs of drug use or alcohol misuse that the employer representative can describe concerning the appearance, behavior, speech, or breath odor of the employee. Suspicion is not probable cause if it is based solely upon third party observation and reports.

3. <u>Post Accident:</u> Employees will be required to undergo a drug/alcohol test whenever an employee reports a work-related injury or is involved in a workplace accident which results in any of the following:
   a. property damage
   b. a fatality or personal injury requiring treatment by a medical practitioner that includes lost time.

Transportation to and from the testing facility will be provided by the company. Only qualified medical/laboratory personnel will administer drug and alcohol tests and all positive results will undergo a second confirmation test:
   a. a positive drug test will be confirmed through gas chromatography/mass spectrometry,
   b. alcohol tests indicating the presence of alcohol will be confirmed through another breath test which will be reported as positive if test produces the same results.
   c. all confirmed positive drug test results will be referred to a Medical Review Officer (MRO) for analysis and confirmation of the positive result. The MRO will review the results and documentation and attempt to contact the employee or applicant to discuss the results. The employee can offer any information to the MRO to rebut or explain the results of the drug test. The MRO will decide whether or not to confirm the drug test result as positive and report the results, after his/her review, to the Company.

Test results, as well as the reason for the testing, will be treated as confidential information with results shared on a need-to-know basis only. The employee shall be entitled to the test results at the same time as the company. The refusal of an employee to consent to the taking of urine and/or blood will constitute a presumption of being under the influence of alcohol or drugs and the employee will then be subject to the disciplinary procedures of this policy.

The Marek Group will pay for all costs associated with drug and alcohol testing. The Company will pay for all lost wages associated with negative test results. Refusal to submit to an alcohol and/or substance screen will be considered a positive test result and will be treated in accordance with the policy. Failure to comply with any portion of this policy will subject an employee to discipline pursuant to the policy.

Any employee testing positive for post accident or reasonable suspicion testing will be required, following the first offense, to successfully complete any recommended treatment, to sign a last chance agreement, and be subject to random testing for 12 months after returning to work. Failure to follow any of these steps or a future positive test within three (3) years and not to exceed two (2) total will result in immediate loss of employment Any employee who voluntarily submits themselves to counseling or treatment, (either in-patient or outpatient) and who is not otherwise in violation of the policy or a last chance agreement, will not be considered in violation of this policy by virtue of the self-referral alone.   An employee may grieve the application of this policy under the grievance and arbitration procedure.

# EXHIBIT 3

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 3 to COMPLAINT - 89
2:20-cv-02074

**Contribution Increases if Rehabilitation Plan is Adopted on or after January 1, 2011**

If the bargaining parties do not adopt the rehabilitation plan prior to January 1, 2011, the required contribution increases will be determined prior to the year of adoption. However, the increases will be no less than the required contribution increases if the plan was adopted prior to 2011, plus the following additional temporary contribution amounts. The additional contributions are intended to offset for the difference between the surcharge contribution and the additional contributions for employers who adopt the rehabilitation plan before 2011.

| Adoption Year | Additional Contribution |
| --- | --- |
| 2011 | 1% per month of adoption after 2010, payable for a period of 12 months. For example, adoption effective July 1, 2011 will require an additional contribution of 6% for a period of 12 months. |
| 2012 | 12%, plus 2% per month of adoption after 2011, payable for a period of 12 months. For example, adoption effective July 1, 2012 will require an additional contribution of 24% for a period of 12 months. |
| 2013+ | 50%, plus 2% per month of adoption after 2012, payable for a period of 12 months. For example, adoption effective July 1, 2013 will require an additional contribution of 62% for a period of 12 months. |

**Minimum Base Shift Rate**

As noted above, the base contribution cannot be reduced for future bargaining agreements. In addition, effective for agreements adopted on or after January 1, 2010, the Plan will require a minimum base contribution rate of $2.00 per shift, or its equivalent. Contribution increases will be calculated using this base rate.

**Minimum Total Annual Contribution by Employer**

For each participating employer, the rehabilitation plan also requires a minimum total annual contribution. Effective for each calendar year on or after the adoption of the rehabilitation plan by the bargaining parties, the required minimum total annual contribution (including the base contribution and the rehabilitation plan contribution increases) for each employer (determined on a controlled group basis) will be no less than the total annual contribution for that employer from September 1, 2008 through August 31, 2009. No benefits will accrue for any additional contributions required under this provision.

If an employer is required to make an additional contribution to meet this minimum contribution, it will be eligible for a contribution credit (up to the amount of the additional minimum contribution it made) in any of the three succeeding years following a year in which the minimum was payable, if total contributions exceed the minimum.

> *Example 3*: An employer's total contribution for the period from September 1, 2008 through August 31, 2009 is $50,000, based on 10,000 shifts and a contribution rate of $5.00 per shift.

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.
GCIU-ERF Rehabilitation Plan (Sep-09) - 12
Doc 1

EXHIBIT 3 to COMPLAINT - 90
2:20-cv-02074

The bargaining parties adopted the rehabilitation plan in 2010.  In 2012, the required contribution is $6.25 per shift, including a base rate of $5.00 and an additional contribution of $1.25, based on the required 25% increase.  The employer reports 7,500 shifts in 2012, with contributions equal to $46,875.   An additional contribution of $3,125 is required for this employer, because $46,875 is $3,125 less than the minimum contribution of $50,000.  This additional contribution will be calculated and communicated following the 2012 year.

In 2013, the same employer contributes $75,000.  Because this total amount is greater than the $50,000 minimum by more than $3,125, the employer will receive a credit of $3,125.  This credit will be determined after the 2013 year.

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.
Doc 1

GCIU-ERF Rehabilitation Plan (Sep-09) - 13

EXHIBIT 3 to COMPLAINT - 91
2:20-cv-02074

Amendment No. 1 to the
Rehabilitation Plan for the
GCIU-Employer Retirement Fund
(Effective November 1, 2009)

This is to certify that the Board of Trustees of the GCIU-Employer Retirement Fund, at its meeting on May 16, 2012, did adopt the following amendments to its Rehabilitation Plan to correct scrivener's errors and clarify certain provisions of the document. This Amendment is effective November 1, 2009.

1.   On page 12, the section entitled "Contribution Increases if Rehabilitation Plan is Adopted on or after January 1, 2011," the section of the chart showing the additional contributions required for employers who adopt the rehabilitation plan in 2013+ is amended to remove the references to "50%" and "62%" and replace them with "36%" and "48%," respectively.

2.   On page 12, under the section entitled "Minimum Total Annual Contribution by Employer," the second sentence of paragraph 1 is deleted in its entirety and replaced with the following:

"Minimum Total Annual Contribution by Employer

...Effective for each calendar year on or after the adoption of the rehabilitation plan by the bargaining parties, the required minimum total annual contribution (including the base contribution and the rehabilitation plan contribution increases) for each employer (determined on a contract-by-contract basis) will be no less than the total annual contribution for that employer from September 1, 2008 through August 31, 2009."

*  *  *

3.   On page 12, under the section entitled "Minimum Total Annual Contribution by Employer," the following is added as the fourth and fifth sentences of paragraph 1.

"Minimum Total Annual Contribution by Employer

...Where an employer adopted (or the Fund automatically updated) the rehabilitation plan mid-year, the minimum annual contribution requirement will be calculated on a pro rata basis for that calendar year. The same is true in

1

GCIU-Employer Retirement
Fund, et al. v. The Marek Group, Inc.

EXHIBIT 3 to COMPLAINT - 92
2:20-cv-02074

situations where an employer ceases making contributions
to the Plan mid-year due to a closure and/or withdrawal."

* * *

Executed this 16th day of May 2012.

_____          _____
Chairman                           Secretary

2